**RAMO, INC., et al., Petitioners,**

v.

**H. E. ENGLISH et al., Respondents.**

**No. B–3202.**

Supreme Court of Texas.

Sept. 19, 1973.

Rehearing Denied Nov. 14, 1973.

Clark, Thomas, Harris, Denius & Winters, Donald S. Thomas, Sander W. Shapiro and Mary Joe Carroll, Austin, for petitioners.

Johnson, Bromberg, Leeds & Riggs, Louis P. Bickel, Muse, Currie & Kohen, Ralph Currie, Burford, Ryburn & Ford, Logan Ford and J. Dan Bohannan, Jackson, Walker, Winstead, Cantwell & Miller,

J. Robert Norris, Jr., Dallas, for respondents.

WALKER, Justice.

We are concerned here with the construction and application of certain provisions in instruments exchanged by the buyers and sellers when the stock of a motor freight transportation company was sold several years ago. The sellers are seeking to accelerate the maturity of notes given as part of the purchase price, while the buyer is attempting to prevent acceleration and to recover damages for alleged breaches of warranties made by sellers in connection with the sale.

H. E. English and several members of his family, hereinafter referred to as English, were the original owners of Red Ball Motor Freight, Inc. They agreed to sell all the stock of Red Ball to Ramo, Inc., a corporation controlled by Texas Capital Corporation, now Telecom Corporation and hereinafter referred to as Telecom. The agreed price for Red Ball and its two wholly owned subsidiaries[1] was $15,500,000, payable $4,000,000 in cash and the balance evidenced by Ramo's notes aggregating $11,500,000. The sale was consummated on June 21, 1968, by exchange of the following instruments: (1) a series of nine notes executed by Ramo in the aggregate principal amount of $11,500,000 and payable to different members of the English family; (2) a noteholders' security agreement executed by Ramo, English, Red Ball and Telecom; (3) an instrument of representations, warranties, covenants and agreements executed by English; and (4) an instrument of representations and warranties executed by Ramo and Telecom. The notes, payment of which was guaranteed by Telecom, bear interest at the rate of 5% per annum and are payable as follows: (a) Nos. 1, 2 and 3 aggregating $3,188,000 matured on January 2, 1969; (b) Nos. 4, 5 and 6 aggregating $2,493,600 are payable in quarterly installments begin-

---

1. English Equipment Co., Inc., and English Realty Co., Inc.

ning January 2, 1972; and (c) Nos. 7, 8 and 9 aggregating $5,818,400 are payable in quarterly installments beginning January 1, 1975.

All amounts accruing on the notes have been paid as they matured, and there is no complaint in that regard. The balance unpaid on the principal of the notes at the time of trial was $8,132,000. About a year after the sale was consummated, English notified Ramo and Red Ball that the lease by the latter of certain certificates of necessity constituted an act of default under the security agreement. A few weeks later, Ramo, Red Ball and Telecom were notified that the sale of certain real estate might constitute an act of default. English also filed an affidavit in each county in which a Red Ball subsidiary owned land for the purpose of preventing the sale of real estate.

Ramo, Red Ball and Telecom, who together are referred to herein as Ramo-Tel, then instituted the present suit against English for a declaratory judgment construing the security agreement, to recover damages for alleged breaches of warranty, and to obtain injunctive relief preventing a foreclosure for any of the asserted acts of default that occurred prior to institution of suit and requiring that the affidavit be expunged from the records. English filed a cross action alleging 24 separate acts of default under the security agreement and that the maturity of the notes had been accelerated as authorized by the agreement, and praying for the recovery of the balance unpaid on all the notes, plus interest and attorneys' fees, and for foreclosure of the lien securing the notes.

The case was tried to a jury, and one of the jury's findings was disregarded by the trial court on motion of Ramo-Tel. On the basis of the other findings and its construction of the various instruments, the trial court rendered judgment: (1) construing the security agreement substantially in accordance with the contentions of

Ramo-Tel; (2) granting Ramo a setoff of $787,500 for breach of warranty; (3) expunging the affidavit and granting the injunctive relief sought by Ramo-Tel; and (4) denying English any recovery on the cross action. The Court of Civil Appeals upheld the award to Ramo for breach of warranty but concluded that certain cash advances by Red Ball to Ramo constituted dividends as a matter of law, that the distributions were in violation of the security agreement, and that English was entitled to accelerate maturity of the notes and foreclose the lien securing same. The judgment of the trial court was accordingly reversed and the cause was remanded to the district court with instructions to render judgment on the notes for the balance unpaid thereon, plus interest and attorneys' fees, less the amount of the offset for breach of warranty as found by the jury, and for foreclosure of the lien on the Red Ball stock. Tex.Civ.App., 474 S.W.2d 600.

All parties filed applications for writ of error. The application of Ramo-Tel was granted because we were of the tentative view that the Court of Civil Appeals erred in concluding that it could not properly order a general remand in the interest of justice. The application of English was granted because of the granting of the Ramo-Tel application. After further consideration it is our opinion that the Court of Civil Appeals erred in holding that an act of default entitling English to accelerate maturity of the notes was established as a matter of law.

Sections 5 and 6 of the security agreement provide for acceleration of maturity in the following terms:

5. *Events of Default.* Any of the following events shall constitute a default hereunder:

\* \* \* \* \* \*

(e) . . .; or if the Debtor defaults in the performance of any covenant, condition or agreement contained in this Agreement, and if such default mentioned in this paragraph shall not

have been remedied to the satisfaction of the holders of the Notes issued hereunder, within thirty (30) days after written notice thereof shall have been received by the Debtor from such holder or holders, same shall constitute an act of default.

6. *Remedies upon Default.* Upon default of the Debtor, as defined in this agreement, the holder of any Note issued hereunder may, at the option of such holder, mature the entire indebtedness of said Notes, and may, by written notice to the Debtor and the Trustee, declare the Notes issued hereunder to be, and such Notes shall thereupon become, forthwith due and payable, without any presentment, demand, protest or other notice of any kind (save as provided herein), all of which are hereby expressly waived, anything contained herein or in any of the Notes to the contrary notwithstanding . . . .

The Court of Civil Appeals held that breach of the following dividend limitation, set out in Section 7 of the security agreement, was established by the evidence as a matter of law:

7. *Covenants of Debtor.* So long as any of the Notes issued hereunder are outstanding, Debtor covenants and agrees:

\* \* \* \* \* \*

(e) *Dividends.* Red Ball may cause its Subsidiaries to issue and pay cash dividends to Red Ball in such amounts as shall be deemed advisable by the directors of said· corporation. Debtor may likewise cause Red Ball to declare and pay cash dividends to Debtor on its outstanding capital stock, except that such dividends may only be declared out of profits accruing after the date of this agreement, and no dividends shall be declared or paid which would reduce the continued capital and surplus of Red Ball and its subsidiaries below the aggregate capital and surplus, as of March 31, 1968.

During the period from June 24, 1968, to October 1, 1969, cash advances aggregating $2,272,375.81 were made by Red Ball to or for the benefit of Ramo. English contends and the Court of Civil Appeals held that the payments constitute dividends within the meaning of the security agreement, while Ramo insists that they were loans. Only one issue relating to these contentions was submitted to the jury. This was Special Issue No. 18. In response thereto the jury found that on the occasion of each transfer of funds by Red Ball to Ramo, the latter at the time had no intention of repaying the same. On motion of Ramo-Tel the finding was disregarded by the trial court as immaterial.

Telecom owns 89% of the stock of Ramo, and Ramo owns all the stock of Red Ball. According to the testimony of Grogan Lord, who is Chairman of the Board of each company, the three were run just like one company. Five of the six Red Ball directors are also directors of Telecom, and four of the six Red Ball directors are also directors of Ramo. The initial and major advance of $1,500,000, which was used by Ramo to make part of the cash payment to English, was authorized by Red Ball's board of directors. The minutes of the meeting state, in part, that:

The Chairman announced that the next order of business was to cause Red Ball Motor Freight, Inc., to loan to Ramo, Inc., the sum of $1,500,000. Whereupon, upon motion duly made and seconded, it was unanimously

Resolved that the corporation loan to Ramo, Inc., on an open account payable on demand, the sum of $1,500,000.

There are no resolutions by Red Ball's board of directors authorizing any of the advances except the first, and there are no resolutions by Ramo's board of directors concerning any of the advances. Each of the transactions was entered on Red Ball's books as "advance receivable," and on Ramo's books as "advance payable." All of the advances were authorized by Grogan

Lord, and the several transactions were handled by the Vice-President for finance of Red Ball. A new President chosen to head Red Ball shortly after the sale was closed did not know of the advances.

On January 16, 1970, Red Ball borrowed $250,000 from a bank in Louisiana, and on March 3, 1970, $200,000 from the National Bank of Commerce in Dallas. Each of these loans was evidenced by notes bearing interest at the rate of 9½% per annum. During the period from September 19, 1969, to March 17, 1970, Red Ball borrowed a total of $1,425,000 from Telecom. Notes were given for each of these loans, and the notes provided for interest at the rate of 8½% and 9% per annum. On April 15, 1970, shortly before the trial of the present case, Telecom advanced $1,400,000 to Ramo. Ramo paid that amount to Red Ball on the advances, and Red Ball paid the $1,425,000 in notes owing to Telecom. These were simultaneous transactions. Ramo eventually executed notes covering each of the advances made to it by Red Ball. This was done a few days before the trial of the present case, and there is no evidence that the notes were formally delivered to Red Ball.

■ Ramo-Tel recognizes that the advances by Red Ball to Ramo could not have been made out of profits accruing after June 21, 1968. If the advances constitute dividends within the meaning of the security agreement, English is entitled to accelerate maturity of the notes. There is no contention that dividends were formally declared by Red Ball, but this is not of controlling importance. A distribution of money or property by a corporation to its shareholders may constitute a dividend in law even though not formally designated as such by the board of directors.

The Court of Civil Appeals held with respect to the alleged breach of the dividend limitation: (1) that there is evidence to support the jury's finding in response to Special Issue No. 18; (2) that this finding disposes of the only possible issue of fact

concerning the nature of the advances; and (3) that as a matter of law and entirely aside from the finding, the advances constitute dividends within the meaning of the security agreement. For reasons that will be set out below, it is our opinion that the right of English to accelerate maturity of the notes must rest on the third of these holdings. It will be discussed first.

A loan is an advance of money on an agreement, express or implied, to repay at some time in the future, while the term "dividend" as ordinarily used means a corporate distribution that the shareholder is entitled to receive and retain without any obligation of repayment. A basic and essential difference between a loan and a dividend then is the presence or absence of a legal obligation to repay. This was recognized by the Court of Civil Appeals, but the court apparently regarded the distinction as unimportant in the present case. It "conceded that a bona fide loan from Red Ball to Ramo, evidenced by a note providing a definite maturity date at a reasonable rate of interest and secured in such manner as sound business judgment would require" would not be a dividend within the meaning of the security agreement. In holding that the advances were nevertheless dividends, the court emphasized that no notes were given for and no interest paid on the advances; that Ramo's use of Red Ball's funds without interest was in itself a substantial detriment to Red Ball and a substantial benefit to Ramo in the nature of a dividend; and that the advances were, as a practical matter in view of the relationship between the several companies, repayable at the sole discretion of Ramo. The following excerpts from the opinion are also relevant:

.  .  .  The obvious purpose of that [dividend limitation] provision was to maintain the financial strength of Red Ball so that in the event of default by Ramo the noteholders would be assured of collecting the balance of their notes by a trustee's sale of Red Ball's stock, .  .  .

. . . Thus it is clear that the advances to Ramo resulted in precisely the type of financial weakness which the dividend limitation was designed to prevent.

\*    \*    \*    \*    \*    \*

. . . We are unwilling to permit the dividend limitation to be circumvented by so transparent a device as entering the withdrawals on the books as "accounts receivable" and calling them loans. We hold that regardless of the form of the transaction, a distribution of corporate funds to a controlling stockholder because of its stock ownership and for its sole benefit, and repayable at its sole discretion, is a dividend in so far as the rights of creditors are concerned.

■ As we understand the opinion of the Court of Civil Appeals, it held that the advances are dividends within the meaning of the security agreement even though they may be loans in the sense that Ramo was legally obligated to repay on demand. This is contrary to the basic rule that must be observed in construing and applying a contract authorizing acceleration of maturity. The proper approach was stated in Crumley v. Ramsey, Tex.Civ.App., 93 S. W.2d 191 (wr. ref.), and repeated in Motor & Indus. Finance Corp. v. Hughes, 157 Tex. 276, 302 S.W.2d 386, as follows:

In our opinion, there was no such default in the payment of the monthly installments provided for in the note as to mature the entire indebtedness under the above-quoted automatic acceleration clause. In the beginning, it should be noted that a contract to thus accelerate the maturity of a debt gives a remedy that is harsh in its nature, and provision therefor, in order to be effective, should be clear and unequivocal; and if there is a reasonable doubt as to the meaning of the terms employed, preference should be given to that construction which will avoid the forfeiture and prevent acceleration of the maturity of the debt. 6 Tex.Jur. 686, § 80; City Nat. Bank v. Pope, (Tex.Civ.App.) 260 S.W. 903;

Parker v. Mazur, (Tex.Civ.App.) 13 S. W.2d 174; 19 Tex.Jur. 799, § 4.

■ Since there is nothing to indicate that the parties intended otherwise, the word "dividends" as used in the security agreement must be given its usual and ordinary meaning. Pan Am. Ins. Co. v. Cooper Butane Co., 157 Tex. 102, 300 S. W.2d 651. In view of the rule discussed above, the term cannot be assigned a broader meaning for the purpose of permitting acceleration of maturity. Under the terms of the security agreement, it is the payment of dividends that is prohibited. No attempt was made to limit the right of Red Ball to make loans to its shareholders or others, or to regulate the manner in which the loans must be evidenced, the interest they must bear, or the nature and value of the security that must be obtained. This is particularly significant in the present case, because Red Ball had made advances to H. E. English and O. B. English, two of the sellers, at various times. The balance unpaid on these advances, which bore no interest and were evidenced only by entries on the books, was $1,684,359.69 at the time the sale was consummated. That amount was paid by H. E. English and O. B. English to Red Ball the night the sale was closed. In these circumstances it is fair to assume that if English had wished to prohibit loans by Red Ball to Ramo, an explicit provision to that effect would have been included in the security agreement.

■ If Ramo was legally obligated to repay the advances, it is our opinion that they were not dividends within the meaning of the security agreement. It is also clear that the evidence does not establish as a matter of law that the advances were dividends rather than loans. The circumstances pointing to that conclusion are rather persuasive, but the initial resolution of Red Ball's directors, the book entries, the subsequent albeit somewhat belated payments by Ramo, and the manner in which the advances to English was handled

would support a finding by the trier of fact that the transactions were loans.

English cites a number of decisions, but none of them supports the conclusion that the advances here were dividends as a matter of law. In a number of cases the trier of fact had made a finding that the distributions were dividends rather than loans, and the appellate court simply upheld the finding because it was supported by the evidence. Central of Georgia Ry. Co. v. Central Trust Co., 135 Ga. 472, 69 S.E. 708; Ogden Co. v. C.I.R., 1st Cir., 412 F.2d 223; Oyster Shell Products Corp. v. C.I.R., 2nd Cir., 313 F.2d 449; Spheeris v. C.I.R., 7th Cir., 284 F.2d 928; Regensburg v. C.I.R., 2nd Cir., 144 F.2d 41; Christopher v. Burnet, 60 App.D.C. 365, 55 F.2d 527. The only question in Bell Bakeries v. Jefferson Standard Life Ins. Co., 245 N.C. 408, 96 S.E.2d 408, was whether there was any basis for *contending* that the money paid by the subsidiary corporation to its parent constituted dividends. In a number of cases there was no contention that the advances were loans. Kohn v. Kohn, 95 Cal.App.2d 708, 214 P.2d 71; Oilwell Chemical & Materials Co. v. Petroleum Supply Co., 64 Cal.App.2d 367, 148 P.2d 720; Alliegro v. Pan American Bank of Miami, Fla.App., 136 So.2d 656; E.M.T. Coal Co. v. Rogers, 216 Ky. 440, 288 S.W. 342; Uccello v. Gold'n Foods, 325 Mass. 319, 90 N.E.2d 530; Nichols v. Olympia Veneer Co., 139 Wash. 305, 246 P. 941; Lengsfield v. C.I.R., 5th Cir., 241 F.2d 508. In several cases the evidence was so conclusive that reasonable minds could not fail to agree that the distributions were dividends. Smith v. Moore, 9th Cir., 199 F. 689; Metropolitan Trust Co. v. Becklenberg, 300 Ill.App. 453, 21 N.E.2d 152; In re Wilson's Estate, 85 Or. 604, 167 P. 580.

█ Paraphrasing the language of the court in Lengsfield v. C.I.R., 5th Cir., 241 F.2d 508, whether or not a corporate distribution is a dividend or something else, such as a loan, gift, compensation for services, repayment of a loan, interest on a loan, or payment for property purchased, presents a question of fact to be determined in each case. To weigh the evidence, draw inferences from the facts, and choose between conflicting inferences is, of course, the function of the trier of fact. The evidence in the present case would support a finding that the advances were dividends, but it is not conclusive. The question is an issue of fact, but no issue fairly presenting that question was submitted or requested.

█ The crucial and controlling question is whether the advances were loans or dividends. As pointed out in one brief filed by English, the issue "is whether the transfers of Red Ball money to Ramo were in truth loans or whether they were dividends masquerading as loans." This question can be answered only by making a choice between two conflicting inferences that are raised by the facts proved. It could have been submitted by an issue inquiring whether the handling of the transactions as loans was a subterfuge, or by an inquiry that enabled the jury to find, under suitable instructions, that the advances were dividends rather than loans. The question was not resolved, however, by the finding in response to Special Issue No. 18. The fact that Ramo did not intend to repay the advances is not controlling, and the jury's answer to the issue was properly disregarded by the trial court. If the transactions were bona fide loans and Ramo was legally obligated to repay on demand, the fact that Ramo did not intend to pay would not alter the legal effect of the transaction. Ramo may have expected to arrange for cancellation of the indebtedness after the English notes had been paid and released, but that would not have converted the advances into dividends within the meaning of the security agreement at the time the payments were made. Since no issue submitting the dividend question was given or requested, this independent ground of recovery must now be deemed as waived. Rule 279, Texas Rules of Civil Procedure.

English had points of error in the Court of Civil Appeals contending that other acts

of default on the part of Ramo or Telecom were established as a matter of law or raised by the evidence. These points were considered by the intermediate court and overruled in its opinion on first motion for rehearing. That opinion was subsequently withdrawn, and the questions were not further considered by the Court of Civil Appeals. English has brought the same contentions forward by cross points of error. We agree with the Court of Civil Appeals in the view expressed in its withdrawn opinion that as a matter of law the alleged breaches do not amount to defaults justifying acceleration and foreclosure. No purpose will be served by a detailed discussion of the several questions here, and the cross points are overruled.

English also filed a conditional application for writ of error. Points of Error Nos. 1 to 54, inclusive, present the law questions raised by their Points of Error Nos. 38 to 98, inclusive, in the Court of Civil Appeals. All of them relate to the $787,500 setoff awarded to Ramo for breach of warranty by English. All of these points were considered and overruled by the Court of Civil Appeals, some for reasons stated in its published original opinion and others for reasons stated in an unpublished supplemental opinion. We have carefully considered each of the contentions brought forward by the conditional application for writ of error, and in our opinion none of them warrants a reversal or modification of the award for breach of warranty.

■ In view of our conclusions concerning the alleged breach of the dividend limitation, Point No. 55 in the conditional application and several points in the Ramo-Tel application are not material to a disposition of the case. Point No. 6 in the Ramo-Tel application asserts that the Court of Civil Appeals erred in failing to grant an additional setoff because of the breach by English of certain financial warranties. There is no merit in this contention. The $787,500 awarded by the trial court for breach of warranty is the difference, as found by the jury, between the value of the Red Ball stock if the warranties were true and its value if the warranties were false. The jury also found, in effect, that no further diminution in the value of the stock was caused by breach of the financial warranty; and, contrary to the argument now advanced by Ramo-Tel, the evidence does not establish conclusively that additional damage resulted from such breach.

The judgment of the trial court allowed Ramo and Telecom a setoff of $787,500 plus interest thereon at the rate of 6% per annum from June 21, 1968, until the due date of any principal or interest against which the same is applied, and directed that the offset be applied to discharge, as they accrue, successive payments of principal and interest maturing on the notes. This is somewhat advantageous to Ramo and Telecom, because the notes bear interest at the rate of 5% per annum. The Court of Civil Appeals sustained Points of Error Nos. 99, 100 and 101 in the English brief there, and held that the setoff should not be a separate judgment bearing interest but should be applied proportionately to reduce the last maturing principal of all the outstanding notes and that the excess of any interest payments previously made should be applied in like manner as credits on the principal of the notes. These holdings, which are now attacked by Ramo-Tel, are sound in view of the pleadings and the provisions of the security agreement.

By Points of Error Nos. 102 and 103 in the Court of Civil Appeals English complained of the provision in the trial court's judgment directing that English pay any charges due the Mercantile National Bank at Dallas, the trustee named in the security agreement. These points were also sustained by the intermediate court, and no attack has been made on that holding here.

The judgment of the Court of Civil Appeals is accordingly set aside, and the judgment of the trial court is modified in the following respects:

(1) The provisions concerning the manner in which the setoff shall be credited on

the notes are modified to provide: (a) that the $787,500.00 shall be credited as of June 21, 1968, on the several notes in the following proportions: $400,050.00 on Notes Nos. 4 and 7 held by H. E. English, $319,725.00 on Notes Nos. 5 and 8 held by O. B. English, and $67,725.00 on Notes Nos. 6 and 9 held by Sally English Ward and Fletcher W. Ward; (b) that if any interest has been paid on any of the notes in an amount larger than would have been required in view of the credits now ordered, the excess shall also be credited as an advance payment on principal; and (c) that all credits shall be applied on the principal last maturing on the notes owing to the respective noteholders; and

(2) The provision concerning charges due the Mercantile National Bank at Dallas is deleted.

As so modified, the judgment of the trial court is affirmed. The costs of appeal are taxed one-half against English and one-half against Ramo-Tel.

SAM D. JOHNSON, J., not sitting.