

**MEMORANDUM OPINION**

No. 04-07-00431-CV

**IN THE INTEREST OF B.C.**, D.C., and C.C., Children

From the 198th Judicial District Court of Kerr County, Texas
Trial Court No. 06-321-B
Honorable Emil Karl Prohl, Judge Presiding

Opinion by:      Rebecca Simmons, Justice

Sitting:         Alma L. López, Chief Justice
                 Karen Angelini, Justice
                 Rebecca Simmons, Justice

Delivered and Filed:  October 29, 2008

AFFIRMED

Julie C. appeals an order terminating the parent-child relationship with her three daughters, B.C., D.C., and C.C. Julie C. contends in a single issue that the evidence is legally and factually insufficient to support the trial court's judgment terminating her parental rights.[1] Having reviewed the record, we disagree. The evidence enables the trial court to "'reasonably form a firm belief or conviction'" that the State's allegations are true and that termination of Julie C.'s parent-child relationship is in the best interest of the children. *See In re J.L.*, 163 S.W.3d 79, 84 (Tex. 2005) (quoting *In re J.F.C.*, 96 S.W.3d 256, 266 (Tex. 2002)). Thus, we affirm the trial court's judgment.

---

[1] Julie C.'s original brief challenged the constitutionally of section 263.405(i) of the Texas Family Code. *See* TEX. FAM. CODE ANN. § 263.405(i) (Vernon Supp. 2006). On March 12, 2008, Julie C. filed a one issue amended brief challenging only the legal and factual sufficiency of the evidence supporting the trial court's judgment. Under our local rules an amended brief "completely replaces the original brief." 4TH TEX. APP. (SAN ANTONIO) LOC. R. 8 notes & cmts. Because Julie C. did not include the constitutionality challenge in her amended brief, we do not address it.

**BACKGROUND**

Julie C. was married and had three daughters, B.C., D.C., and C.C. Julie C. and her husband, Daniel, were arrested and incarcerated on several occasions after the birth of their children. When Julie C. was incarcerated, she left her children in the care of her mother, Charlotte P. Although Charlotte P. cared for the children, she failed to supervise them adequately. Caseworkers from the Department of Family and Protective Services (the Department) reported the oldest child left Charlotte P.'s home and wandered the neighborhood streets unsupervised, the other two children were left in dirty playpens for excessively long periods, and all of the children exhibited developmental delay.

In October 2005, the Department suggested Julie C. obtain services for herself and the children. Julie C. failed to act on the case supervisor's suggestion. On April 22, 2006, a caseworker from San Antonio visited Charlotte P.'s home and found the house to be unsanitary and hazardous and found that D.C. had open blisters on her mouth. On May 1, 2006, Julie C. was drug tested as part of the Department's intensive family services; she tested positive for cocaine. The Department filed an emergency removal request, and the children were removed from Charlotte P.'s home on May 9, 2006. At a termination hearing on May 10, 2007, after hearing several witnesses, the trial judge ruled that the Department had proven, by clear and convincing evidence, its allegations of endangerment and failure to comply with a court order and that it was in the best interest of the children for Julie C.'s parental rights to be terminated. Daniel did not respond or appear at the hearing, and his parental rights were also terminated. Only Julie C. appeals.

**STANDARD OF REVIEW**

A trial court may involuntarily terminate the parent-child relationship if it finds by clear and convincing evidence that: (1) the parent has committed at least one of the grounds for involuntary termination in section 161.001(1) of the Texas Family Code; and (2) "termination is in the best interest of the child." TEX. FAM. CODE ANN. § 161.001 (Vernon 2002); *In re J.L.*, 163 S.W.3d at 84. Although the two elements must be proven independently, the same evidence may be probative of both issues. *In re C.H.*, 89 S.W.3d 17, 28 (Tex. 2002). In reviewing the legal sufficiency of the evidence under the clear and convincing standard, an appellate "'court should look at all the evidence in the light most favorable to the finding to determine whether a reasonable [factfinder] could have formed a firm belief or conviction that its finding was true.'" *In re J.L.*, 163 S.W.3d at 85. We assume all disputed facts were resolved "in favor of [the] finding if a reasonable factfinder could do so." *Id*. When reviewing the factual sufficiency of the evidence, we must consider all of the evidence to determine if it "is such that a factfinder could reasonably form a firm belief or conviction about the truth of the State's allegations." *In re C.H.*, 89 S.W.3d at 25.

**FIRST PRONG ANALYSIS: ENDANGERMENT**

**A.      Definition of Endangerment**

Under the Family Code, a Texas court may involuntarily terminate a parent's rights if the parent "engaged in conduct or knowingly placed the child with persons who engaged in conduct which endangers the physical or emotional well-being of the child." TEX. FAM. CODE ANN. § 161.001(1)(E) (Vernon 2002). The Texas Supreme Court has addressed what "endanger" means: "'[E]ndanger' means to expose [a child] to loss or injury; to jeopardize." *Tex. Dep't of Human Servs. v. Boyd*, 727 S.W.2d 531, 533 (Tex. 1987). While "'endanger' means more than a threat of

metaphysical injury or the possible ill effects of a less-than-ideal family environment, it is not necessary that the conduct be directed at the child or that the child actually suffers injury." *Id.* Section 161.001(1)(E) endangerment must be a direct result of a parental course of conduct including both the parents's acts and omissions. *See In re B.S.T.*, 977 S.W.2d 481, 484 (Tex. App.—Houston [14th Dist.] 1998, no pet.), *overruled on other grounds*, *In re C.H.*, 89 S.W.3d at 17. A parental course of "conduct that subjects a child to a life of uncertainty and instability endangers the physical and emotional well-being of a child." *In re R.W.*, 129 S.W.3d 732, 739 (Tex. App.—Fort Worth 2004, pet. denied). Thus, "[n]eglect can be just as dangerous to [a] child's emotional and physical health as intentional abuse." *In re W.J.H.*, 111 S.W.3d 707, 715 (Tex. App.—Fort Worth 2003, pet. denied).

## B. Reviewable Grounds for Termination

### 1. The Department Claims Waiver Regarding Conduct

We first consider the allegation under section 161.001(1)(E) that Julie C. "engaged in conduct or knowingly placed the child[ren] with persons who engaged in conduct [that] endanger[ed]" the children's physical or emotional well-being. *See* TEX. FAM. CODE ANN. § 161.001(1)(E) (Vernon 2002). The Department claims Julie C. waived the issue regarding whether the evidence was insufficient to prove that Julie C. "engaged in conduct" which endangered the physical or emotional well-being of the children because she did not present this precise issue to the trial court. However, Julie C. included, in her statement of points, an assertion that the evidence was insufficient to support the finding that Julie C. knowingly placed her children "with persons who engaged in conduct which endanger[ed] the physical or emotional well-being of the child[ren]." *See* TEX. FAM. CODE ANN. § 161.001(1)(E) (Vernon 2002).

**2.       No Supporting Authority for Separate Grounds**

The Department cites no authority supporting the proposition that section 161.001(1)(E) contains two separately reviewable grounds for termination, i.e., (1) the parent engaged in conduct which endangered the children and (2) the parent "knowingly placed the child[ren] with persons who engaged in conduct which endanger[ed]" the children. *See id.* We conclude Julie C.'s statement of points was specific enough to allow the trial judge to correct any erroneous findings on the challenged grounds, one of which was section 161.001(1)(E). Accordingly, we fully address Julie C.'s legal and factual sufficiency issue with regard to section 161.001(1)(E). *See id*.

**C.       Evidence of Julie C.'s Endangerment of Her Children**

To address Julie C.'s issue of legal and factual sufficiency, we begin by reviewing the evidence.

**1.       Julie C.'s Inadequate Supervision**

The Department presented evidence that on August 10, 2004, while under Julie C.'s direct supervision, four-year-old B.C. left Charlotte P.'s house alone, wandered off, and ended up at a neighborhood residence three blocks away. Because the resident did not know B.C., she called the sheriff's office. The responding officer "recognized [B.C.] from a previous incident, where she had walked away from a babysitter's residence" six months earlier.

**2.       Children's Abject Living Conditions**

The Department also presented evidence that, while in Charlotte P.'s care: (1) D.C. and C.C.'s diapers were often "very full" and the children had severe diaper rash; (2) D.C. was found to have numerous open blisters on her mouth; and (3) D.C. was often sick with various illnesses due to putting rotten food or other filthy objects in her mouth. Also, the Department presented evidence

that Charlotte P. self-reported (1) keeping D.C. and C.C. in playpens for twenty-three out of twenty-four hours a day, and (2) despite D.C.'s several disabilities, "popping" D.C. in the mouth because D.C. bit her.

### 3. Julie C.'s Adverse Behaviors

The Department's evidence further showed that prior to the children's removal, Julie C. was often incarcerated or in drug rehabilitation programs. Her absence created a situation where the children had to be placed with Charlotte P. because Julie C. had no other options. Julie C. testified that she had strong concerns that her mother was not physically able to care for the children. However, when Julie C. was at Charlotte P.'s home, she did not participate in the children's assistance programs, did not enroll her children in other services, and was hostile toward the Department's involvement. Julie C. also lived with Nichole England, a woman she met in prison, who had an extensive criminal history including driving while intoxicated, theft by check, and cruelty to animals.

### 4. Children's Developmental Status

The Department's evidence regarding the children's developmental status after they were removed from Charlotte P.'s home supported the Department's allegations that living in Charlotte P.'s care endangered the children's physical and emotional well-being.

#### a. B.C.'s Well-Being

B.C. was severely developmentally delayed and had a speech impediment while living with Charlotte P. and Julie C. After she was removed, B.C. was reported to be "doing really well" by Diane Oehler, executive director of Hill Country CASA, Inc. Oehler testified that B.C. was being passed to second grade in a regular curriculum.

### b.      D.C.'s Well-Being

At the time D.C. was removed from Charlotte P.'s home, D.C. had been previously misdiagnosed with Refsum's Disease, blindness, and deafness. Oehler testified that, although D.C. is autistic, she does not have Refsum's Disease and is not blind or deaf. Rather, Oehler testified D.C. has leukodystrophy, a degenerative neurological disease. On being removed from Charlotte P.'s home, D.C. could not walk and only scooted on her bottom. After removal and some time under a teacher's specialized care, D.C. was "up and walking with a walker" despite being one of the most severely autistic children D.C.'s teacher has taught in over twenty years. Now, D.C. can stack blocks and peg boards into towers because of the care she received after she was removed.

### c.      C.C.'s Well-Being

When C.C. was removed from Charlotte P.'s home, she was also developmentally delayed and had severe behavioral problems. She would bite, kick, hit, spit, and refuse to take direction. She exhibited "startle reflex" because she was afraid of physical punishment. Now, according to Oehler, C.C.'s behaviors have improved and she can "play by herself."

## D.      Evidence Challenging Julie C.'s Endangerment of Her Children

Besides evidence on the children's improved behaviors after being removed, the court also heard evidence challenging the Department's assertions that Julie C.'s conduct endangered her children.

### 1.      Favorable Investigative Reports

On July 17, 2003, the Department reported possible neglect of the children. On July 31, 2003, a Kerr County sheriff's investigator found that the children were "clean, well nourished, and well taken care of." He reported that "it did not appear that there was a health hazard or unsanitary

conditions present" and recommended that the case be closed. Similarly, after a report of neglect on April 22, 2006, a Kerrville police investigator found D.C. to be sitting on a baby chair and eating, though she had one sore on the left side of her mouth which was dry and healing. Although the investigator's report is silent regarding the condition of the home, he went into the residence to see D.C. and recommended that the case be closed as unfounded. Elise Kinler of Homespun Early Intervention gave D.C. bi-weekly home-based physical therapy for about eighteen months. Ms. Kinler testified the children had delayed development from being kept in playpens but that the children were well fed. She also testified that there was an adult present in the home at each visit.

### 2.    Julie C.'s Parenting Course, Discontinued Drug Use

Julie C. completed her parenting course shortly before the termination hearing, but she completed many of her services within weeks after the children were removed. Brad Golden, who taught the parenting course, testified that Julie C. and Nichole were both "fantastic" and "very eager to learn everything that I had. They wanted to do whatever they could to get the tools that I had to offer, and they were great students." Golden stated: "From what they told me at the end, . . . they were having effective results from [the class]." Further, Julie C. and Nichole participated in the family services and neither had tested positive for drugs since the children were removed.

### 3.    Julie C.'s Changed Residence

At approximately the same time that the children were removed from Charlotte P.'s residence, Nichole and Julie C. moved out as well and were living in a three-bedroom, two-bath home where they had prepared a room in which the children could live. The house had a big front yard and a fenced-in back yard. The living room and kitchen were open creating a large room for activities. Nichole testified that the condition of the home was clean and sanitary. Nichole and Julie

C. had scheduled an appointment with caseworker Tanya Castro to visit their home to verify its appropriateness for the children, but Castro did not show up for the appointment.

**E.      Basis for Trial Court's Reasonable, Firm Belief or Conviction**

The trial court, as the factfinder, "has the authority to weigh the evidence, draw reasonable inferences therefrom, and choose between conflicting inferences." *In re R.D.S.*, 902 S.W.2d 714, 716 (Tex. App.—Amarillo 1995, no writ) (citing *Ramo, Inc. v. English*, 500 S.W.2d 461, 467 (Tex. 1973)).  In reviewing the record, we conclude that the trial court could have reasonably formed a firm belief or conviction that Julie C. "engaged in conduct or knowingly placed the child[ren] with persons who engaged in conduct which endanger[ed] the physical or emotional well-being of the child[ren]." TEX. FAM. CODE ANN. § 161.001(e) (Vernon 2002); *see In re R.D.S.*, 902 S.W.2d at 715-16 (affirming the trial court's judgment terminating a mother's parent-child relationship).

**1.      Sufficient Evidence Supporting the Finding of Endangerment**

Here, the evidence is both legally and factually sufficient for the court to have reasonably formed a firm belief that: (1) the conditions in Charlotte P.'s home were unsuitable for small children; (2) Julie C.'s criminal course of conduct endangered her daughters by forcing her to place them with Charlotte P. while she was incarcerated or in drug rehabilitation, *Boyd*, 727 S.W.2d at 533; (3) B.C. was in physical danger when she was allowed to roam the streets unsupervised; (4) B.C. was emotionally at risk because she was not provided any services to address her developmental delays; (5) D.C. and C.C. were in physical danger because they were kept in an environment where hazardous food and other objects were left within reach; (6) D.C. and C.C. were emotionally at risk because they were kept in playpens for excessively long periods and were not provided services to address their developmental delays; (7) Julie C. refused to participate or enroll in proper services for

the children to get the medical, nutritional, and educational assistance they needed, and her refusal endangered her children's physical and emotional well-being; and (8) Julie C. tested positive for cocaine use which put her children at risk in that they would have to stay with Charlotte P. even longer.

### 2. Single Subsection Violation Sufficient for Termination

Because we find sufficient evidence to support the trial court's finding of endangerment under subsection 161.001(1)(E), we need not address Julie C.'s sufficiency issues concerning other subsections. *See In re S.F.*, 32 S.W.3d 318, 320 (Tex. App.—San Antonio 2000, no pet.) ("[O]nly one finding alleged under section 161.001(1) is necessary to a judgment of termination.").

### SECOND PRONG ANALYSIS: BEST INTEREST OF THE CHILDREN

Having determined that the trial court could have reasonably formed a firm belief or conviction that Julie C. engaged in conduct which endangered the physical or emotional well-being of her children, we turn to the second prong for involuntary termination of the parent-child relationship: whether "termination is in the best interest of the child." *See* TEX. FAM. CODE ANN. § 161.001(2) (Vernon 2002). We analyze the evidence in support of the trial court's finding that termination of Julie C.'s parental rights was in the best interest of the children. *See id.*; *In re J.L.*, 163 S.W.3d at 84. Although the trial court could have applied the evidence to one or more *Holley v. Adams* factors differently than we do here, we decide that the trial court could have reasonably formed a firm belief or conviction that termination of Julie C.'s parental rights was in the best interest of the children. *See Holley v. Adams*, 544 S.W.2d 367, 371-72 (Tex. 1976) (listing factors to consider when deciding whether to involuntarily terminate a parent-child relationship).

**A.** *Holley* **Factors for a Child's Best Interest**

To determine whether involuntary termination of the parent-child relationship is in a child's best interest we consider the *Holley* factors: (1) the child's desires; (2) the child's present and future emotional and physical needs; (3) the present and future emotional and physical danger to the child; (4) "the parental abilities of the individuals seeking custody"; (5) the programs available to those seeking custody to help "promote the best interest of the child"; (6) the plans those seeking custody have for the child; (7) "the stability of the home or proposed placement"; (8) "the acts or omissions of the parent which may indicate that the existing parent-child relationship is not a proper one"; and (9) any excuse for the parent's acts or omissions. *See id.* (listing the factors). Although not an exhaustive list, the *Holley* factors focus on the best interest of the child rather than the best interest of the parent. *See Patterson v. Brist*, 236 S.W.3d 238, 240 (Tex. App.—Houston [1st Dist.] 2006, pet. dism'd) (citing the Family Code requirement that the "primary consideration" is "the best interest of the child," TEX. FAM. CODE ANN. § 153.002 (Vernon 2002)).

**B.** **Children's Desires**

The first *Holley* factor is the child's desire. *Holley*, 544 S.W.2d at 372. The Department presented evidence through Oehler's testimony demonstrating that only B.C. had expressed a desire to return to Julie C., and that D.C. is likely incapable of understanding such a request. Oehler testified that C.C. "is not bonded to her mother. She does not even like her mother very much." C.C. "does not want to go on the visits [with Julie C.] and cries and makes the foster mother promise her that she won't have to stay with her mother."

**C.      Children's Emotional and Physical Needs**

Another *Holley* factor is the present and future physical and emotional needs of the child. Here, all of the children have special educational and emotional needs. D.C. also has long-term medical and physical needs. The Department's evidence showed that the children's present and future needs could best be met if the children were placed for adoption. There was ample evidence that each child's development had improved simply by being removed from Charlotte P.'s home and being placed in a stable foster home. Oehler testified that "if [B.C.] and [C.C.] are going to have any chance of growing up to be normal little girls, they have to get in a permanent adoptive home immediately." The evidence also showed that all of the children, including D.C., were readily adoptable or acceptable for long-term placement.

**D.      Julie C.'s Acts or Omissions Affecting the Parent-Child Relationship**

**1.      Julie C.'s Emotional Interaction with Her Children**

The evidence showed that while Nichole exhibited some positive emotional interaction with the children, Julie C. was distant and had no emotional connection to her daughters. Caseworker Deanna Reyes testified that even during supervised visitation times, Julie C. was unaffectionate, focused on other things, and allowed the children to get into improper situations. Oehler observed "[Julie C.] did not demonstrate, in any visit that I saw, the ability to nurture her children in a fashion that left even two of the three coming away from the visit satisfied and happy." When questioned about the children's developmental issues, Julie C. testified that she did not believe the children were developmentally delayed. The Department's evidence proved this belief to be incorrect indicating Julie C's lack of intimacy with her children.

### 2. Julie C.'s Parental Abilities

Furthermore, Julie C. failed to complete her parenting skills course early in the separation period, and when Julie C. had custody of the children, she refused to utilize the programs available to promote the best interests of the children, even after being counseled and warned many times. At the time of the hearing, Julie C. had not completed her therapy for anger management and psychological problems. Her continued use of drugs after a drug rehabilitation course also established her poor judgment and poor impulse control. Although Julie C. had not failed a drug test since May 1, 2006, her consistent prior inability to avoid criminal conduct implied a conscious disregard for her parental responsibilities.

### 3. Julie C.'s Plans to Care for the Children

Although Nichole and Julie C. had moved into a different house and lived there for a year after the removal of the children, neither Julie C. nor Nichole provided any definite plans about how they would provide for the children and take care of the children's needs while they both worked.

### 4. Julie C.'s Excuses for Actions

According to several caseworkers, Julie C. had denied any responsibility for the children's issues, had been hostile toward the Department, and had been "hateful" and "very self-consumed." The evidence indicated Julie C. still harbored these feelings on the day of the termination hearing. She blamed unreturned telephone calls, changing caseworkers, and her "obsessive hours" for her inability to timely complete her services.

### E. Termination of Julie C.'s Parental Rights is in the Best Interest of the Children

Applying the appropriate standards of review, we conclude that the evidence is legally and factually sufficient to support the trial court's finding that the termination of Julie C.'s parental rights

is in the best interest of the children.  *See In re J.L.*, 163 S.W.3d at 85; *In re C.H.*, 89 S.W.3d at 25. Accordingly, we overrule Julie C.'s sole issue.

**CONCLUSION**

Having found that the evidence was legally and factually sufficient to support at least one ground for termination and that termination of the parent-child relationship is in the best interest of the children, we affirm the trial court's judgment.

Rebecca Simmons, Justice