

# In The
# Court of Appeals
# Sixth Appellate District of Texas at Texarkana

_____

## No. 06-08-00070-CV
_____

ALLAN L. BURNS, INSULATION SUPPLY COMPANY, ISC BUILDING
MATERIALS, INC., AND ISC BUILDING MATERIALS, L.P., Appellants

V.

LAWRENCE S. STANTON, Appellee

On Appeal from the 162nd Judicial District Court
Dallas County, Texas
Trial Court No. 07-03948-A

Before Morriss, C.J., Carter and Moseley, JJ.
Opinion by Chief Justice Morriss

OPINION

Allan L. Burns and Lawrence S. Stanton, previously co-owners of a successful building materials company, Insulation Supply Co. (ISC), went their separate ways. As part of the separation, Stanton, a former president and director of ISC, left with a nice buyout package, under which he was initially paid as a consultant and later also sold his shares of corporate stock back to ISC for seven figures. All obligations were secured with one-half of the ISC corporate stock. Those transactions were completed in 2005. ISC initially was a corporation,[1] but in 2006 was converted into a limited partnership[2] to save taxes. When Stanton learned of the conversion and its surrounding transactions, he declared default and sought payment of the substantial sums due on the consulting agreement and the promissory note. Faced with competing motions for summary judgment, the trial court rendered summary judgment for Stanton.

Burns and the companies[3] appeal from the summary judgment rendered in favor of Stanton.

---

[1]The corporation was originally named Insulation Supply Company, but, on August 4, 2005, changed its name to ISC Building Materials, Inc. For the purposes of this opinion, the name change by the corporation is not material.

[2]The limited partnership is named ISC Building Materials, L.P.

[3]All three company names—Insulation Supply Company; ISC Building Materials, Inc.; and ISC Building Materials, L.P.—are listed as co-parties with Burns. Distinguishing among the entities is not material to this appeal, except to the extent we address the conversion from corporate status to limited partnership status. The companies will be indiscriminately referred to herein as "ISC," except where the distinction between corporation and partnership is important. In that case, the corporation—Insulation Supply Company or, after its name change, ISC Building Materials, Inc.—will be called "ISC Corporation" and the partnership—ISC Building Materials, L.P.—will be called "ISC Partnership."

2

When reviewing a summary judgment, we take as true all evidence favorable to the nonmovant and indulge every reasonable inference and resolve any doubts in the nonmovant's favor. *Limestone Prods. Distrib., Inc. v. McNamara*, 71 S.W.3d 308, 311 (Tex. 2002); *Rhone-Poulenc, Inc. v. Steel*, 997 S.W.2d 217, 223 (Tex. 1999).  On appeal, the movant must show there is no material fact issue and that the movant is entitled to judgment as a matter of law.  *McNamara*, 71 S.W.3d at 311.

In general, an order granting a summary judgment may be appealed, but an order denying a summary judgment may not.  *Novak v. Stevens*, 596 S.W.2d 848, 849 (Tex. 1980).  An exception to this rule exists when both parties file motions for summary judgment and the court grants one and overrules the other.  *Tobin v. Garcia*, 159 Tex. 58, 316 S.W.2d 396, 400 (1958).  On appeal, the proper disposition is for the appellate court to render judgment for the party whose motion should have been granted.  *Members Mut. Ins. Co. v. Hermann Hosp.*, 664 S.W.2d 325, 328 (Tex. 1984); *Tucker v. Allstate Tex. Lloyds Ins. Co.*, 180 S.W.3d 880 (Tex. App.—Texarkana 2005, no pet.).

The essential facts in this case are established by the numerous documents in the record.  The determination of the competing motions for summary judgment rests on the interpretation of those documents in answering only two issues joined by the parties:  (1) whether default occurred as a result of the conversion transaction and (2) whether notice of intent to accelerate the maturity of the obligations owed to Stanton was given to Burns and ISC or was waived.  Because we conclude that

3

default did occur and that notice of intent to accelerate maturity was given, we affirm the summary judgment in favor of Stanton.

*Factual Background*

Stanton and Burns owned (and operated) ISC. They each owned one-half of the stock in the company, 125,000 shares each. They were also sole directors of the company. In 2002, Stanton retired and became a consultant for an annual salary of $120,000.00. By 2005, the two had decided to part ways, and Stanton sold his shares of stock back to ISC for $1.25 million.

ISC executed a note to Stanton, agreeing to pay Stanton the purchase price and interest in monthly installments beginning in April 2005. ISC also continued the consulting agreement, to pay Stanton an additional $10,000.00 per month for eighty-three months, and $310,000.00 on month eighty-four. Burns personally guaranteed payment. The agreements effectuating the sale went into effect March 8, 2005, and the payments began.[4]

In 2006, Burns and ISC Corporation realized that approximately $280,000.00 could be saved annually on taxes if ISC was converted from a corporation to a limited partnership. Without getting Stanton's permission, a conversion was accomplished. Burns conveyed his 125,000 shares of common stock to ISC Holdings General Partnership, which accomplished the conversion of ISC from corporate to limited partnership form. In the conversion, ISC Corporation became ISC Partnership and the shares of stock became partnership interests. One resulting partnership unit was

---

[4]The evidence shows that ISC continued making full and timely payments to Stanton throughout the lawsuit and until the date judgment was entered.

4

conveyed to ISC GenPar, L.L.C. The transaction was quite detailed, but all the details are not necessary here.

Pre-existing before the conversion was a Security Agreement securing the payment to Stanton of the promissory note and consulting agreement; the collateral was the 125,000 shares of common stock in ISC Corporation acquired by ISC Corporation from Stanton in the buyout. Stanton claims that the conversion transaction, or at least some of its elements, constituted a default under the Security Agreement.

*(1)     Default Occurred as a Result of the Conversion Transaction*

No claim was made that payments were in default; the claim is that the alleged default was properly categorized as a nonpayment default. The core question is whether default occurred in the process of the reorganization of ISC, when Burns' stock in ISC Corporation was exchanged for various partnership interests in ISC Partnership, hinging on whether that exchange included a "transfer" of the corporate shares.

Among various other acts defined in paragraph 2.01 of the Security Agreement as falling within the term "Event of Default," subparagraph h defined default to include "[t]he transfer . . . by Burns . . . of any shares of common stock of the Company owned by Burns as of the effective date of this Agreement."

In the Spring of 2006, ISC Corporation was converted into ISC Partnership. A preliminary step involved in that conversion was Burns' execution of a document dated April 14, 2006, and titled

5

"Assignment and Power of Attorney," which contains this operative language: "I, Allan L. Burns, hereby sell and *transfer* unto ISC Holdings General Partnership, all of the Common Stock of ISC Building Materials, Inc. issued and outstanding in the name of Allan L. Burns." (Emphasis added.) That assignment is the operative document that put Burns' 125,000 shares into the partnership. In that document, Burns also irrevocably appointed the corporate secretary as his attorney in fact "to *transfer* said stock" on the books of the Corporation. (Emphasis added.)

As of April 21, 2006, the Plan of Conversion was adopted by ISC Holdings General Partnership, wherein that partnership is recited as being "all of the shareholders of ISC Building Materials, Inc." Burns executed the Plan of Conversion as the Managing Partner of the ISC Holdings General Partnership, not in his individual capacity as a shareholder or a former shareholder of the ISC Corporation. It seems clear that, as of the time of the Plan of Conversion, Burns was no longer a shareholder of ISC Corporation. Paragraph 1.01(6) of the Plan of Conversion provides that the "outstanding shares" of the "sole shareholder"—that is, the Partnership—would be deemed to have been automatically converted into partnership units. One hundred of those partnership units would be issued, one of which would be "*transferred*" to ISC GenPar, L.L.C., as general partner. (Emphasis added.) Implicitly, ninety-nine partnership units would be retained by the Partnership. Also an additional ninety-nine limited partnership units and one additional general partnership unit would be issued as, presumably replacement, collateral on the obligations owed to Stanton.

6

We apply the plain meaning of the above language and conclude that Burns' conveyance of all of his shares of common stock to the Partnership on April 14 was a "transfer" within the meaning of the Security Agreement's definition of default, providing Stanton the trigger needed in order for him to declare a default.

Even if, somehow, Burns' transfer of all of his shares to the partnership could be seen as something other than a "transfer" within the meaning of the Security Agreement, we note that the Plan of Conversion provides that one percent of the proceeds of those shares, that is, the partnership interests, would be "*transferred*" by the Partnership to ISC GenPar, L.L.C. (Emphasis added.)

We conclude a transfer of Burns' stock, and thus a defined event of default, occurred.

*(2)     Notice of Intent to Accelerate Maturity Was Given*

Burns and ISC claim that Stanton did not adequately give notice of his intention to accelerate the indebtedness, and that, therefore, acceleration was improper. Even with an event of default, an acceleration of maturity is improper unless there was either a proper notice of intent to accelerate maturity or a waiver of such a notice. Because we conclude that such notice was given, we do not address waiver.[5]

---

[5]A debtor may waive his or her right to demand, presentment, and notice. *See Shumway v. Horizon Credit Corp.*, 801 S.W.2d 890, 892 (Tex. 1991). A waiver of presentment, notice of intent to accelerate, and notice of acceleration is effective, however, only if it is clear and unequivocal. *Id.* at 893. Waiver of "notice" or even "all notice" or "any notice whatsoever," without more specificity, does not waive the right to notice of intent to accelerate. *Id.*; *Adams v. First Nat'l Bank of Bells/Savoy*, 154 S.W.3d 859, 868 (Tex. App.—Dallas 2005, no pet.); *see Mastin v. Mastin*, 70 S.W.3d 148, 155 (Tex. App.—San Antonio 2001, no pet.). Therefore, it appears that notice of intent to accelerate maturity must have been given. We conclude, however, that it was given.

7

A negotiable instrument that is payable at a definite time may provide for the right of acceleration of the debt on default. TEX. BUS. & COM. CODE ANN. § 3.108(b) (Vernon 2002). Because acceleration of a debt is viewed as a harsh remedy, however, any such clause will be strictly construed. *See Ramo, Inc. v. English*, 500 S.W.2d 461, 466 (Tex. 1973). Texas law requires clear notice of intent to exercise acceleration rights, followed (if the debtor continues in default) by notice of actual acceleration. *See Ogden v. Gibraltar Sav. Ass'n*, 640 S.W.2d 232, 233–34 (Tex. 1982). If the required notices are given, acceleration occurs.

On December 7, 2006, Stanton's attorneys sent a letter to ISC and Burns, as well as Comerica Bank, advising that default had occurred and that "Stanton will take all applicable enforcement action (including enforcement action as defined by the Subordination Agreement, against" ISC and Burns, once the ninety-day period set out by the Subordination Agreement had run. Though the letter did not use the phrase "intent to accelerate" or its equivalent, its incorporation of the Subordination Agreement's definition of "enforcement action" had that effect.

To encourage Comerica Bank to finance ISC's operations, Stanton had entered into the Subordination Agreement with the Bank, and that Agreement had been acknowledged by ISC and Burns. That Agreement labeled Comerica Bank as the "Bank," Stanton as the "Creditor," ISC as the "Borrower," Burns as the "Guarantor," all obligations ISC or Burns owed to Stanton as the

8

"Subordinated Indebtedness,"[6] and all obligations ISC or Burns owed to the Bank as the "Senior Indebtedness."  It also specifically contained a definition of "Enforcement Action":

> As used herein, "Enforcement Action" means . . . to initiate or to participate with others in any suit, action or proceeding against Borrower or any Guarantor to enforce payment or to collect all or any part of the Subordinated Indebtedness . . . or the Senior Indebtedness . . . or *to accelerate the Subordinated Indebtedness* (in the case of Creditor) or the Senior Indebtedness (in the case of the Bank).

(Emphasis added.)

Therefore, when Stanton gave the December 7, 2006, notice of default and that he intended to take "all applicable enforcement actions," that notice necessarily included the required notice of intent to accelerate the maturity of the ISC and Burns obligations to Stanton.

Under these facts, the trial court properly rendered summary judgment in favor of Stanton. Accordingly, we affirm the judgment.


_____  Josh R. Morriss, III
                                          Chief Justice

Date Submitted:     April 30, 2009
Date Decided:       June 4, 2009

_____

[6]In paragraph 1 of the Subordination Agreement, the obligations included within the term "Subordinated Indebtedness" are broadly defined:  "any and all obligations and liabilities of Borrower or any Guarantor to Creditor, including, without limit, principal and interest payments, whether direct or indirect, absolute or contingent, joint or several, secured or unsecured, due or to become due, now existing or later arising and whatever the amount and however evidenced . . . ."