**STATE of Missouri, Respondent,**

v.

**Keyonda Roshell LUMPKINS, Appellant.**

**No. WD 71602.**

Missouri Court of Appeals, Western District.

Sept. 20, 2011.

Margaret M. Johnston, Columbia, MO, for Appellant.

Jamie P. Rasmussen, Jefferson City, MO, for Respondent.

Before JAMES EDWARD WELSH, P.J., JAMES M. SMART, JR., and JOSPEH M. ELLIS, JJ.

JAMES EDWARD WELSH, Presiding Judge.

Keyonda Roshell Lumpkins appeals the circuit court's judgment convicting her of the class A felony of second-degree felony murder. Lumpkins contends that the circuit court erred when: (1) it denied her motion for continuance to consult with and obtain an expert; (2) it refused to give her proposed second-degree involuntary manslaughter instruction, and (3) it refused to give her proposed second-degree endangering the welfare of a child instruction. We affirm.

Viewing the evidence in the light most favorable to the verdict, the evidence established that Lumpkins met Horace Johnson in the summer of 2005. Their relationship produced a son, Cortez Johnson, who was born on March 27, 2006.

For much of the Cortez's life, his father was in jail. Horace Johnson was released to a halfway house in April 2008. Shortly thereafter, Horace Johnson absconded from the halfway house and moved in with Lumpkins. On June 10, 2008, Horace Johnson was shot in the leg and hospitalized. On June 16, 2008, Horace Johnson returned to Lumpkin's apartment.

From June 16, 2008, to June 25, 2008, Lumpkins, Horace Johnson, and Cortez were together in the apartment. One afternoon during that time frame, Johnny Brown came to visit Horace Johnson. In the apartment, Brown saw Cortez standing in the corner of the room with his hands duct taped behind his back. The victim was naked, shaking, and looked like he had been crying. Horace Johnson told Brown that Cortez had been "running around pissing and shitting on hisself [sic] or something like that."

Also during that time frame, Horace Johnson's two sisters and two cousins from Arkansas came to stay with him for three days. During their visit, Horace Johnson's sister, Erma Johnson, asked about Cortez because she did not see him in the apartment. Lumpkins and Horace Johnson told her that Cortez was "in the room." The next day, Erma Johnson walked in Lumpkins's and Horace Johnson's room and saw Cortez on a sheet on the floor of the closet. Erma Johnson and her sister picked Cortez up and held him for a short time. When Erma Johnson held Cortez, she said that Cortez seemed "drained" as if he had no energy. She said that he had burn marks on his face and was in poor condition. Lumpkins and Horace Johnson said that Cortez was being kept in the closet because he was being bad. Before Cortez returned to the closet, Horace

Johnson told Lumpkins to "whoop him." Lumpkins then retrieved a belt and hit Cortez three or four times on his bottom. Cortez started crying and then went back in the closet.

According to Erma Johnson, Lumpkins seemed happy to her throughout their three day visit. Erma Johnson also said that, a couple of times during her visit, they would all leave the apartment and go somewhere, except for Lumpkins and Cortez.

On June 17, 2008, Lumpkins met Sullonge Turner at the courthouse.[1] The meeting lasted about ten minutes. Lumpkins did not say anything to Turner about any problems that Lumpkins was having at home, and Turner did not see any visible injuries on Lumpkins. Lumpkins also saw her mother on June 17 and 19, 2008. Lumpkins did not say anything to her mother about any problems that Lumpkins was having at home, and her mother did not see any visible injuries on Lumpkins. On June 19, Lumpkins went with her mother to arrange for a power of attorney so that her mother could care for Lumpkins's children if Lumpkins was unable to do so.

On June 25, 2008, at around 10:00 a.m., Lumpkins and another woman came into the emergency room at University Hospital in Columbia. Lumpkins was carrying Cortez in her arms. According to the emergency room's registration receptionist, Lumpkins was not crying, and Lumpkins's demeanor was very "flat" and nonexpressive. The receptionist said that Lumpkins would not answer her when she asked for the child's name.

When Cortez arrived in the emergency room, his body temperature was approxi-

---

1. Although the jury did not know this, Sullonge Turner worked with Adult Court Services and was meeting with Lumpkins be-cause Lumpkins was on house detention for misdemeanor stealing.

mately 85 degrees. The medical staff attempted to do CPR on Cortez but was unsuccessful. Multiple injuries were all over Cortez's body including his lips, forehead, nose, neck, scalp, torso, arms, private area, and buttocks.

Based upon Cortez's body temperature and the amount of rigor mortis, the forensic pathologist said that, although it was hard to estimate with a child, it appeared to him that Cortez had been dead for four to six hours before he had been brought to the hospital. During his autopsy, the pathologist catalogued over 200 injuries on Cortez's body. The forensic pathologist said that there were numerous injuries on most surfaces of Cortez's body.

Cortez had injuries to his lips and nose that were days to a week old and that were either caused by a blunt force or by a burn. He had some injuries on his forehead that were inflicted closer in time to his death and some that were months old. He had injuries to his left cheek, with a newer injury over an older injury. On the right cheek, Cortez had an injury that looked like a hot, flat object had been placed on his cheek. On the left and right side of his neck, Cortez had hypopigmentation which indicated older injuries. Cortez's frenula were torn and his two front teeth were loose, indicating blunt trauma to the face. Cortez had possible burns on his shoulders that were several weeks old, and he had healing abrasions on his shoulders that were days to months old. Cortez had blunt force injuries to his scalp and marks on his ears that were either abrasions or burns. Cortez had numerous injuries of various ages on his stomach and back that were either abrasions or burns. Cortez had a large burn on his right buttock and had abrasions and linear contusions on his arm that were consistent with a ligature being placed around his wrists. These injuries to his wrists were weeks to

months old. Cortez's penis had multiple burns around the tip. He had injuries to his ankle and toes, and he had bruising on the back of his legs which was consistent with blunt force injuries. Examination of Cortez's head and brain revealed several hematomas, hemorrhages, and subscapular contusions. One of the hematomas was older, but one was consistent with a recent injury. The brain injuries would have required a significant amount of force to create and were not consistent with an accidental fall. The brain swelling caused pressure on the portion of the brain responsible for controlling respiration and heartbeat; that pressure eventually caused Cortez's death. The cause of Cortez's death was due to blunt force injuries to the head.

Lumpkins was questioned by a detective at the hospital on the day of Cortez's death. During the first interview, Lumpkins told police that Cortez's father lived in Arkansas and that she was no longer seeing him. She claimed that Cortez had been visiting a cousin in Arkansas and that the cousin had brought Cortez home late the night before. According to Lumpkins, when Cortez got home, the cousin put him to bed immediately. Lumpkins said that, when she woke up, she noticed bruises all over Cortez. She said that, after she saw the bruises, she wrapped him in a t-shirt and ran outside to get help. She said that she flagged down a stranger to take her to the hospital and that she called Cortez's aunt, Nanetta Johnson, to meet them at the hospital.

When confronted with information provided by Nanetta Johnson, Lumpkins admitted that she had come to the hospital with Nanetta Johnson, but she said that she did want to tell the police about it because she did not want the police to know that Nanetta Johnson was the sister of Horace Johnson and that she did not

want to get Nanetta Johnson involved. Lumpkins then admitted that she knew that Horace Johnson had recently been shot in Columbia and that she tried to see him in the hospital on June 11, 2008. She said that the last time she saw Horace Johnson was on June 15, 2008, and that Horace Johnson took Cortez to Arkansas. She still maintained that Cortez's cousin brought Cortez home from Arkansas, that the cousin put Cortez to bed, and that she discovered the bruises all over Cortez's body the next morning. Lumpkins added, however, "that she failed her son because she didn't protect him." She also gave the police permission to search her home because she did not believe they would find anything.

After these statements, the police took Lumpkins to the police station. Lumpkins was advised of her *Miranda* rights, and another interview commenced. Lumpkins admitted that Horace Johnson had been living with her since he had run away from the halfway house. She said that Horace Johnson had stolen her apartment key and that he was living with her against her will. She said that, after Horace Johnson was shot and left the hospital, they returned to the apartment on June 16, 2008. She said that Cortez did not have any injuries prior to June 16. Lumpkins admitted that, from the time they got home from the hospital on June 16 until the time that she brought Cortez to the hospital on June 25, Horace Johnson severely beat Cortez with his hand and a belt.

Lumpkins admitted that she kept Cortez in the closet and made a pallet for him on the floor. She also admitted that she would make Cortez stay up all night, so that he would sleep during the day. She said that she made Cortez stand in the corner for punishment and that he would be punished for "pooping and peeing on the floor." She denied that Cortez was

ever burned, but she said that Cortez had picked up a lit cigarette and had burnt his mouth.

She also claimed that Horace Johnson was beating her from the time he got out of the hospital until June 25. She said that he was beating her all over her body—hitting and punching her in the head, face, arms, and legs. The police, however, did not see any injuries on Lumpkins consistent with the extensive beatings she described. Lumpkins told the police that she was not afraid of anything. She said that she left the apartment only twice from June 16 to June 25. She admitted that there were times that she could have left and called the police, but she did not ever do that. She said that, after Horace Johnson was shot in the leg, she could have gotten away from him and that there were times she could have left if she wanted to.

Lumpkins told the police that she gave Cortez a bath four or five days before he died. She said that at that time he was fine and that she only saw a few minor marks on him. She said that she saw injuries on Cortez's buttocks and the legs. She repeatedly claimed that she did not see Cortez being abused the last two days of his life. She said that Horace Johnson kept Cortez away from her. However, later on, she admitted that she had been at the apartment during all of this and knew about it.

Lumpkins told the police that, on June 25, 2008, she was going to give Cortez a bath. She said that Horace Johnson brought Cortez into the bathroom and that she put Cortez into the bathtub. She said that Cortez could not hold himself up and that he was not able to play in the tub. She said that she did not leave the house immediately because she did not have "any long pants on and a pair of shoes." Eventually, after picking up Nanetta Johnson,

Horace Johnson drove Nanetta Johnson, Lumpkins, and Cortez to the hospital.

A number of Lumpkins's family members testified in Lumpkins's defense. They testified that they saw Cortez during the early part of June and did not notice any major injuries. Lumpkins also testified in her own defense. She stated that she saw Horace Johnson punish Cortez by spanking him with his hand. She also said that she saw Horace Johnson "whoop" Cortez with a belt. She denied ever whipping Cortez herself. She said that one time Horace Johnson became angry with her because she had been gone too long so he tied her up with duct tape. While she was tied up, she saw that Horace Johnson had Cortez standing in the corner naked with his hands duct taped behind his back. Most of the time, however, she said that Horace Johnson would not let her near Cortez. She said that she initially lied to the police because Horace Johnson told her to and she was afraid of him. She also said that she never had the chance to leave Horace Johnson.

Lumpkins was charged with one-count of second degree felony murder. A jury found her guilty of second-degree felony murder, and the circuit court sentenced her to twenty-four years in prison. Lumpkins appeals.

In her first point on appeal, Lumpkins contends that the circuit court abused its discretion when it denied her motion for a continuance to consult with an independent burn expert. Lumpkins argues that she needed additional time because she learned a week before she filed her motion for continuance that the State's expert would provide testimony that some of Cortez's burns had occurred at different times and that there was no indication that the State's expert had included such an opinion in his report. She claims that she needed to consult with a burn expert to rebut that testimony.

A decision to deny a continuance is within the sound discretion of the circuit court, and we will not interfere with that decision absent a very strong showing of abuse and prejudice. *State v. Taylor*, 944 S.W.2d 925, 930 (Mo. banc 1997). "We will reverse the circuit court's denial of a continuance only when the circuit court abuses its discretion by entering a ruling that is clearly illogical and is arbitrary and unreasonable." *State v. Clark*, 263 S.W.3d 666, 669 (Mo.App.2008), *overruled in part on other grounds as recognized by State v. Reando*, 313 S.W.3d 734 (Mo.App.2010).

Rule 24.10 governed the circuit court's consideration of Lumpkins application for a continuance. It requires that an application aver:

(a) The facts showing the materiality of the evidence sought to be obtained and due diligence upon the part of the applicant to obtain such witness or testimony;

(b) The name and residence of such witness, if known, or, if not known, the use of diligence to obtain the same, and also facts showing reasonable grounds for belief that the attendance or testimony of such witness will be procured within a reasonable time;

(c) What particular facts the affiant believes the witness will prove, and that he knows of no other person whose evidence or attendance he could have procured at the trial, by whom he can prove or so fully prove the same facts;

(d) That such witness is not absent by the connivance, consent, or procurement of the applicant, and such application is not made for vexation or delay, but in good faith for the purpose of obtaining a fair and impartial trial.

Failure to comply with Rule 24.10 alone is sufficient reason to sustain the circuit court's denial of Lumpkins's application for a continuance. *State v. Patton,* 84 S.W.3d 554, 556 (Mo.App.2002).

■ Lumpkins's motion did not satisfy Rule 24.10's requirements. In regard to her seeking a continuance [2] to consult an independent burn expert, Lumpkins merely said: "The Defendant requires additional time to consult with experts regarding thermal burn wounds allegedly found on the victim." The motion did not show (1) the materiality of the evidence, (2) the name of the prospective witness or facts showing reasonable grounds for belief that the attendance or testimony of such witness will be procured within a reasonable time, or (3) the facts that Lumpkins believed the witness would prove. These violations of Rule 24.10 were sufficient for the circuit court to deny the continuance. *Id.*

Moreover, "[i]nadequate preparation does not justify a continuance where counsel had ample opportunity to prepare." *Taylor,* 944 S.W.2d at 930. When Lumpkins requested the continuance on August 3, the trial was set to begin on August 31. Lumpkins had almost an entire month to complete her preparation after the denial of the motion. The circuit court did not abuse its discretion in denying the motion for a continuance.

■ In her second point, Lumpkins contends that the circuit court erred in refusing her instruction for second degree involuntary manslaughter. In particular, she asserts that involuntary manslaughter in the second degree was a lesser included offense of felony murder in the second degree and that the circuit court should have given her instruction because there was a basis in the evidence from which the

jury could have found that she acted with criminal negligence rather than knowingly. We disagree.

■ We note that Lumpkins proffered instruction did not comply with MAI CR–3d 314.14 and the Notes on Use. In the pattern instruction for second-degree involuntary manslaughter, the second element is listed as "that the defendant was *[Insert specific act or acts of negligence such as violating an electrical signal, driving on the wrong side of the road, etc.]*." MAI–CR 3d 314.14. In Lumpkins's proffered instruction, that element is listed as "that in so doing, defendant created a substantial risk to the life or body or health of [the victim.]" Apparently, the act of negligence—leaving the victim in an abusive environment—was inserted into the blank in the statement of the first element instead of the cause of death—blunt trauma to the head—and the second element was replaced with language similar to that used in the instruction for child endangerment. *See* MAI–CR 3d 322.10 and MAI–CR 3d 322.11. Thus, the instruction was erroneous as it did not correctly state the elements of either crime. When a proffered lesser included instruction does not comply with the MAI–CR 3d or its Notes on Use, any error in the refusal of such an instruction may be reviewed only for plain error. *State v. Cole,* 248 S.W.3d 91, 94–95 (Mo.App.2008). Indeed, "if a lesser-included instruction is mandated, the [circuit] court is obligated to give a correct one and that while the failure of the defendant to provide a correct instruction for that purpose ... waives appellate review ..., it does not waive plain error review, under Rule 30.20." *State v. Beck,* 167 S.W.3d 767, 777 (Mo.App.2005).

2. Lumpkins also sought a continuance on other grounds not at issue here.

Rule 30.20 authorizes this Court to review, in its discretion, "plain errors affecting substantial rights ... when the court finds that manifest injustice or miscarriage of justice has resulted therefrom." Our Supreme Court has established a threshold review to determine if a court should exercise its discretion to entertain a Rule 30.20 review of a claimed plain error. First, we determine whether or not the claimed error "facially establishes substantial grounds for believing that 'manifest injustice or miscarriage of justice has resulted[.]'" *State v. Brown*, 902 S.W.2d 278, 284 (Mo. banc), *cert. denied*, 516 U.S. 1031, 116 S.Ct. 679, 133 L.Ed.2d 527 (1995) (quoting Rule 30.20). If not, we should not exercise our discretion to conduct a Rule 30.20 plain error review. If, however, we conclude that we have passed this threshold, we may proceed to review the claim under a two-step process pursuant to Rule 30.20. In the first step, we decide whether plain error has, in fact, occurred. *State v. Baumruk*, 280 S.W.3d 600, 607 (Mo. banc.), *cert. denied*, —— U.S. ——, 130 S.Ct. 144, 175 L.Ed.2d 93 (2009). "All prejudicial error, however, is not plain error, and plain errors are those which are evident, obvious and clear." *Id.* (citations and internal quotation marks omitted). In the absence of evident, obvious, and clear error, we should not proceed further with our plain error review. If, however, we find plain error, we must continue to the second step to consider whether or not a miscarriage of justice or manifest injustice will occur if the error is left uncorrected. *Id.*

Lumpkins claim does not facially establish substantial grounds for believing that manifest injustice or miscarriage of justice has resulted. Lumpkins contends that involuntary manslaughter in the second degree is a lesser-included offense of felony murder. Section 565.025.2(2), RSMo 2000, says that "[t]he lesser degree offenses[3] of murder in the second degree[4]

**3.** We note that, pursuant to section 565.025.2(2)(b), the legislature says that involuntary manslaughter in the first degree is a *lesser offense* and not a lesser included offense. As the Supreme Court noted in *State v. O'Brien*, 857 S.W.2d 212, 220 n. 2 (1993), the legislature's classification of an offense as a lesser offense does not mean that it is also a lesser-included offense. *But see Walker v. State*, 34 S.W.3d 297, 303–04 and n. 8 (Mo. App.2000). "Conviction for second degree felony murder does not require any intent to kill. It requires a showing that death occurred as a result of perpetration or attempted perpetration of a felony." *State v. Akins*, 829 S.W.2d 619, 620–21 (Mo.App.1992). Involuntary manslaughter requires that the defendant "recklessly" cause the death of another person. "[A]n instruction on a lesser-included offense is appropriate only if it includes some, but not all, of the elements of the greater offense instructed upon, and requires no finding of an essential element in addition to those set out in the verdict director for the greater offense." *State v. Mayer*, 3 S.W.3d 423, 426 (Mo.App.1999). Thus, involuntary manslaughter is not a lesser in-cluded offense of felony murder in the second degree.

**4.** Section 565.021.3, RSMo 2000, says:

Notwithstanding section 556.046, RSMo, and section 565.025, in any charge of murder in the second degree, the jury shall be instructed on, or, in a jury-waived trial, the judge shall consider, any and all of the subdivisions in subsection 1 of this section which are supported by the evidence and requested by one of the parties or the court.

This provision merely provides that, notwithstanding the statute regarding included offenses generally (section 556.046) and the statute regarding the lesser degree offenses of first and second degree murder (section 565.025), in any charge of murder in the second degree, the jury shall be instructed on any and all charges of murder in the second degree conventional or felony murder in the second degree which are supported by the evidence and requested by one of the parties or the court. This statute is not instructive on what offenses are the lesser degree offenses of felony murder in the second degree.

are: (a) Voluntary manslaughter under subdivision (1) of subsection 1 of section 565.023; and (b) Involuntary manslaughter under subdivision (1) of subsection 1 of section 565.024." In regard to involuntary manslaughter, subdivision (1) of subsection 1 of section 565.024, RSMo Cum.Supp. 2010, says: "A person commits the crime of involuntary manslaughter in the first degree if he or she . . . [r]ecklessly causes the death of another person[.]" Lumpkins did not request that the circuit court give an involuntary manslaughter in the first degree instruction based upon section 565.024.1(1). She asked for an involuntary manslaughter in the second degree instruction based upon section 565.024.3, which says: "A person commits the crime of involuntary manslaughter in the second degree if he acts with criminal negligence to cause the death of any person." Involuntary manslaughter in the second degree is not listed as a lesser degree offense under section 565.025.2(2).

■ To be clear, the lesson to be derived from this holding is that, in instructing down from the highest crime charged, there are two sources that must be checked by the circuit court. The first and more traditional source is all lesser included offenses are to be given if requested by either party or the court pursuant to section 556.046, RSMo Cum.Supp.2010. In the instant case, the court properly de-

clined to give an instruction on involuntary manslaughter in the second degree because it is not a lesser included offense of felony murder. Such instruction would require a finding that Lumpkins caused the death of Cortez and had a particular mental state (criminal negligence); neither finding is required for a conviction of felony murder. The second source for instructing down are the particular statutes specific to the highest crime charged, in this case section 565.025.2(2). As indicated above, that statute specifies voluntary manslaughter under section 565.023.1(1)[5] and involuntary manslaughter in the first degree under section 565.024.1(1) are to be given in offenses of second degree murder, including apparently felony murder. This statute does not indicate any other crimes are included in its mandate, and none should be presumed. This is analogous to the treatments courts have given the statutory mandate that felony murder be given in first degree murder cases.[6] In those cases and in our case, the legislature has mandated the giving of instructions for certain offenses when appropriate but that does not make those offenses lesser included offenses. They are merely mandatory crimes to be instructed upon when appropriate. Thus, the circuit court did not err in refusing to give Lumpkins's involuntary manslaughter in the second-degree instruction.[7]

5. Lumpkins does not contend that voluntary manslaughter is applicable in this felony murder case.

6. See our discussion of the *O'Brien* case, *supra* at note 3.

7. Lumpkins also argues that MAI–CR 3d 314.00 Notes on Use No. 4(C)2 provides that when felony murder is the highest homicide degree submitted, an instruction on involuntary manslaughter in the second degree "will be given" if justified by the evidence and requested by one of the parties or on the

court's own motion. Lumpkins pointed out these Notes on Use to the circuit court, and the circuit court said that it did not think that involuntary manslaughter in the second degree was a lesser-included offense of felony murder in the second degree and that if the Notes on Use said that, "the notes on use are wrong." We agree. To the extent that the Notes on Use requires the court to submit an involuntary manslaughter in the second degree instruction in a felony murder case it conflicts with section 565.025.2(2) and should not be followed. *State v. Carson*, 941 S.W.2d 518, 520 (Mo. banc 1997) ("If an instruction

■ In her third point, Lumpkins contends that the circuit court erred in refusing her instruction for endangering the welfare of a child in the second degree. In particular, she asserts that endangering the welfare of a child in the second degree was a lesser included offense of felony murder in the second degree and that the circuit court should have given her instruction because there was a basis in the evidence from which the jury could have found that she acted with criminal negligence rather than knowingly. We disagree.

As we already have mentioned, section 565.025.2(2) says that "[t]he lesser degree offenses of murder in the second degree are: (a) Voluntary manslaughter under subdivision (1) of subsection 1 of section 565.023; and (b) Involuntary manslaughter under subdivision (1) of subsection 1 of section 565.024." Obviously, endangering the welfare of a child in the second degree is not a lesser degree or a lesser included offense of felony murder in the second degree. It is, however, a lesser-included offense of endangering the welfare of a child in the first degree. *Cole*, 248 S.W.3d at 91. Lumpkins, however, was not charged with a count of endangering the welfare of a child in the first degree. The State charged Lumpkins with felony murder in the second degree based upon Lumpkin's perpetration of the felony of endangering the welfare of a child in the first degree as the predicate felony. The felony murder instruction given to the jury required the jury to find:

First, that [Lumpkins] committed endangering the welfare of a child in the first degree, as was submitted in Instruction No. 5.

Second, that Cortez was killed by his head being impacted during abuse in the environment, and

Third, that Cortez was killed as a result of the perpetration of that endangering the welfare of a child in the first degree[.]

If the jury did not make the above findings, no basis existed for convicting Lumpkins of felony murder.

Thus, an instruction on the lesser-included offense of endangering the welfare of a child in the second degree was not appropriate because that possibly would have resulted in a conviction of a crime with which Lumpkins had not been charged. The circuit court recognized this when it refused Lumpkins's instruction and said: "And I think that if the jury were to find her guilty of child endangerment in the second degree, you'd be raising all kinds of hell with me for the fact that she was convicted of something she wasn't charged with." "Due process requires that a defendant may not be convicted of an offense which is not charged in the indictment or information. Therefore, [the circuit] court may not instruct on an offense not specifically charged unless it is a lesser included offense" of the charged offense.[8] *State v. Cowles*, 203 S.W.3d 303, 307 (Mo.App.2006) (citation omitted). Because endangering

---

following MAI–CR 3d conflicts with the substantive law, any court should decline to follow MAI–CR 3d or its Notes on Use."). The felony murder rule derived from common law until the legislature enacted section 565.021 in 1993. *State v. Williams*, 24 S.W.3d 101, 110 (Mo.App.2000).

8. It should be noted that, while child endangerment in the second degree may be a lesser

included offense of child endangerment in the first degree, Lumpkins did not offer it as instructing down on child endangerment in the first degree (the predicate offense for the felony murder and not an offense with which she was charged) but as instructing down on felony murder. As a misdemeanor, child endangerment in the second degree would not suffice as a predicate felony to support a felony murder charge.

the welfare of a child in the second degree is not a lesser included offense of felony murder in the second degree, the circuit court did not err in refusing to give Lumpkins's endangering the welfare of a child in the second degree instruction.

### Conclusion

The circuit court did not err when it denied Lumpkins's motion for continuance, when it refused to give her proposed second-degree involuntary manslaughter instruction, and when it refused to give her proposed second-degree endangering the welfare of a child instruction. We, therefore, affirm the circuit court's judgment.

All concur.