COURT OF APPEALS
EIGHTH DISTRICT OF TEXAS
EL PASO, TEXAS

| | § | |
|---|---|---|
| LAWRENCE C. MATHIS, | | No. 08-10-00310-CV |
| | § | |
| Appellant, | | Appeal from |
| | § | |
| v. | | 126th District Court |
| | § | |
| DCR MORTGAGE III SUB I, L.L.C., | | of Travis County, Texas |
| | § | |
| Appellee. | § | (TC # D-1-GN-09-001377) |

## **O P I N I O N**

Lawrence C. Mathis executed a promissory note on March 31, 2000 in connection with his purchase of an approximately 20,000 square foot building in Austin, Texas. The note was originally made payable to Norwest Bank, N.A. and secured by a deed of trust. DCR Mortgage III Sub I, L.L.C. later acquired the note and deed of trust from Norwest and is the current owner and holder.

On April 10, 2009, DCR appointed a substitute trustee who signed a notice of a May 5, 2009 foreclosure sale. Mathis immediately filed a declaratory judgment action requesting the court to "declare the status of, and the parties' relative rights under" the real estate lien note. Mathis also sought a temporary injunction to enjoin DCR from going forward with the foreclosure sale. On May 27, 2009, the trial court held a hearing on Mathis's application for temporary injunction, and on June 15, 2009, the judge rendered judgment conditionally granting the same.

On June 10, 2010, a few months after a bench trial on the matter, the trial court rendered judgment determining that the note had been accelerated and that DCR was entitled to foreclose

the deed of trust lien. The judgment also awarded DCR attorney's fees, and ordered the court clerk to pay DCR the approximately $105,728.16 which had been deposited by Mathis into the registry of the court pending suit.[1] The trial judge submitted her Findings of Fact and Conclusions of Law on June 30, 2010, and her Amended Findings of Fact and Conclusions of Law on August 5, 2010.

We conclude that DCR was required to give Mathis notice of intent to accelerate the debt and that no such notice was given. Therefore, we hold that any attempted acceleration was improper, and we reverse and remand to the trial court to determine the final computations and provide for disbursements in accordance with this opinion.

### FACTUAL SUMMARY

Lawrence Mathis owns and operates a commercial laser printing and direct mail business in Austin, Texas. On March 31, 2000, he bought an approximately 20,000 square foot building located at 2200 Tillery Street in Austin. Mathis arranged for financing through the Small Business Administration (SBA) 504 program. Generally, the agreement between Mathis and the SBA provided that Mathis would obtain financing through an institutional lender (the first lien holder) for approximately 50% of the purchase price; the SBA, through its affiliated entity Cen-Tex Certified Development Corporation (CDC), would provide second lien financing for approximately 40% of the purchase price; and Mathis would provide the remaining 10% as a down payment.[2] Accordingly, Mathis obtained financing for $440,000 (approximately 50% of the total purchase price) from Norwest Bank, N.A., and on March 31, 2000, Mathis executed a

---

[1] The money deposited into the court's registry was comprised primarily installment payments to have become due on the note and paid monthly into the registry by Mathis.

[2] CDC and Norwest entered into a "Certification by Third Party Lender" and an "Inter-creditor Agreement." In part, these agreements obligated Norwest to provide written notice to CDC and SBA within thirty days of any default upon which Norwest intended to take action and sixty days prior to any foreclosure sale.

first lien note payable to Norwest in the original principal sum of $440,000. The note was secured by a deed of trust signed by the same parties on the same day.[3]

### Terms Of The Agreement

The note was payable in monthly installments of principal plus interest over a twenty year term.[4] It provided that interest would be charged at a floating rate equal to the Wall Street Journal prime rate, and that such rate would be adjusted annually.[5] The monthly installments:

> [M]ay be adjusted from time to time by Holder to reflect changes in the Standard Rate and for advances as provided herein, so that payments shall at all times be

---

[3] Mathis also executed a second lien note payable to CDC in the original principal sum of $365,000 (approximately 40% of the original purchase price). This second lien note was also secured by the deed of trust.

[4] Specifically, the note provided that the "principal and interest, evidenced by this Note (the "Indebtedness")" should be paid as follows:

> Accrued interest only shall be due and payable monthly as it accrues, beginning April 15, 2000 and continuing regularly thereafter until September 15, 2000, when principal and accrued interest shall be due and payable in monthly installments of $4,173.49 or more each, beginning on October 15, 2000 and continuing regularly thereafter until September 15, 2020, when the entire balance hereof, principal and accrued interest remaining unpaid, shall be then due and payable. The payments required herein may be adjusted from time to time by Holder to reflect changes in the Standard Rate and for advances as provided herein, so that payments shall at all times be not less than an amount which would fully pay the unpaid balance of this Note, both as to principal and accrued interest, on a twenty (20) year level amortization beginning September 15, 2000, with the amortization basis declining by one (1) year for each year expiring thereafter during the term of this Note, with any unpaid balance of this Note being due and payable as provided herein.

[5] Wall Street Journal prime rates at the annual adjustment rates relevant to the Note have been as follows:

| | |
|---|---|
| March 31, 2001 | 8.00 |
| March 31, 2002 | 4.75 |
| March 31, 2003 | 4.25 |
| March 31, 2004 | 4.00 |
| March 31, 2005 | 5.75 |
| March 31, 2006 | 7.75 |
| March 31, 2007 | 8.25 |
| March 31, 2008 | 5.25 |
| March 31, 2009 | 3.25 |

not less than an amount which would fully pay the unpaid balance of this Note, both as to principal and accrued interest, on a twenty (20) year level amortization.

Finally, the matured, unpaid principal and interest would bear interest from maturity until paid at the maximum rate allowed by law; or, if no such rate exists, at the "Standard Rate" (a.k.a. the applicable Wall Street Journal prime rate) plus 5% per annum.

The note included an acceleration provision that gave the holder a discretionary right to accelerate the maturity of all debt owed by Mathis in the event that:

> [Mathis/Makers] fail[s] to make timely any payment required by this Note or to perform timely any other obligation owed to Holder, or if any person breaches any covenant made in any Loan Agreement or Deed of Trust, or any other security document, that secures payment of any of the Indebtedness, or in any guaranty agreement by which payment of any of the Indebtedness is guaranteed.

The note also contained the following waiver of notice provision, related to potential acceleration:

> Each of Makers, each guarantor of any of the Indebtedness, and each person who grants any lien or security interest to secure payment of any of the Indebtedness, (i) except as expressly provided herein, waives all notices (including, without limitation, notice of intent to accelerate, notice of acceleration and notice of dishonor), demands for payment, presentment, protest and diligence in bringing suit and in the handling of any security; . . . .

Finally, the deed of trust provided, in part, the following language relating to potential default and acceleration:

> 5. If Grantor defaults on the note or fails to perform any of Grantor's obligations or if default occurs on a prior lien note or other instrument, and the default continues after Beneficiary gives Grantor notice of the default and the time within which it must be cured, as may be required by law or by written agreement, then Beneficiary may:
>
>> a. declare the unpaid principal balance and earned interest on the note immediately due.

*Mathis's Performance on the Note While Owned and Held by Norwest/Wells Fargo*[6]

Mathis admitted that due to business troubles in 2003, he started making late installment payments on the Note. About forty-five or fifty out of approximately seventy payments made while Norwest/Wells Fargo owned the note were untimely. Despite the fact Mathis's payments were late, all of the payments were accepted by Norwest/Wells Fargo, and Norwest/Wells Fargo never informed Mathis that future late payments would not be accepted.

On or about September 15, 2006, DCR acquired the Mathis note and deed of trust from Norwest/Wells Fargo. At the time, Mathis was still several months behind on payments.[7]

*Transactions and Communications Between DCR and Mathis From DCR's Acquisition of the Note Through DCR's Notice of Foreclosure*

**1.** *Mathis's First Two Installment Payments After DCR's Acquisition of the Note (September 2006 through January 2007)*

DCR accepted and posted its first monthly payment from Mathis on September 22, 2006. The payment was applied as the installment due July 15, 2006. In October 2006, DCR sent Mathis eight payment coupons each equal to one installment payment.[8] Mathis did not make his second installment payment to DCR on the note until January 2007. In doing so, he used one of the payment coupons. DCR accepted the payment and posted it on January 24, 2007 as the installment payment due August 15, 2006.

**2. *Mathis's Dealings/Communications with DCR's Senior Vice-President and Portfolio Manager, Lance Amano Throughout 2007***

---

[6] Sometime shortly after execution of the note, Norwest Bank merged into Wells Fargo and Wells Fargo became the note holder and owner.

[7] Prior to purchasing the note, Wells Fargo provided DCR with a professional appraisal of the property (dated July 24, 2006) which showed the property's fair market value to be $1,235,000.

[8] Originally, the monthly installments of principal and interest were $4,173.49. However, at some point prior to DCR acquiring the note, the monthly payments were reduced to $2,601.28.

According to Mathis, DCR's Senior Vice-President and Portfolio Manager, Lance Amano, first contacted him in February 2007. Amano expressed an interest in coming to visit the Property. That same month, Mathis made his third installment payment to DCR. Once again, the payment was accompanied by one of the payment coupons. DCR accepted the payment on February 25, 2007 and posted it as the installment due on September 15, 2006.

In March 2007, Amano did in fact visit the property. Mathis testified that he spoke with Amano about his efforts to market and sell the property and the possibility for considerable profit. In May 2007, Mathis entered into a sales contract for $1.45 million. That same month, Amano and Mathis began a series of e-mail communications. However, the buyer later received an appraisal valuing the property at $1.39 million and insisted Mathis reduce the price. Mathis refused and the deal collapsed. According to Mathis, he was unaware of any acceleration or attempted acceleration of the note at that time. Had he known the note had been accelerated, he would have pursued negotiations with the potential buyer and worked vehemently to reach an agreement. He also would have pursued his options to refinance the property.

In June 2007, Mathis made his next four monthly installment payments accompanied by four more payment coupons.[9] Once again DCR accepted and posted the payments.[10] Two months later (in August 2007), Amano sent Mathis the following e-mail:

> To bring your loan current we need a payment of approximately $22,896. Right now you are accruing interest at a default rate of 13.25%. Below are the terms of a Forbearance agreement that I can offer:
>
> Interest rate    Prime + 1.5%
>
> Terms        12 month term

---

[9] In June 2007, Mathis obtained an additional loan from CDC for $250,000. This loan was secured by a third lien. Mathis remained current on both CDC loans at all times.

[10] The four June 2007 payments were posted as those due on October 15, 2006, November 15, 2006, December 15, 2006, and January 15, 2007.

In response to the e-mail, Mathis called Amano, expressed his confusion regarding how DCR calculated the $22,896 figure as well as the 13.25% interest rate, and requested that Amano send documentation supporting the amounts. Mathis did not hear back from Amano until October 2007 when Mathis received an e-mail with no heading and a blank attachment. Mathis again requested documents to support DCR's calculations, and on December 18, 2007, Mathis received a copy of DCR's loan ledger covering July 15, 2006 through November 30, 2007.

According to DCR's ledger, from July 15, 2006 until DCR acquired the note on September 15, 2006, the interest rate charged on the principal balance was the prime rate, or 7.75%. On September 16, 2006, the ledger bears the notation "DEFAULT RATE STARTS," and the ledger reflects the interest rate charged from thereon as the applicable prime rate plus 5%. The ledger does not bear a notation regarding acceleration. After reviewing the ledger, Mathis again contacted Amano and requested information regarding the interest rate. Amano replied on December 20, 2007 that he would follow up with the loan-servicing department and provide the requested information.

### 3. Mathis's Dealings/Communications with DCR's Senior Vice-President and Portfolio Manager, Lance Amano Throughout 2008

In January 2008, Amano e-mailed Mathis citing the last payment received by DCR and expressing the need to enter into a forbearance agreement. Amano attached a copy of the note and the deed of trust to the e-mail. Mathis responded the following day indicating that he needed to have his attorney review the interest rates. Approximately ten days later, Mathis again e-mailed Amano to inform him that his attorney looked over the documents and concluded that the 5% default surcharge on the interest rate should only be applied to payment arrears. Mathis's

email also explained his attorney's conclusion that applying the 5% interest surcharge to the entire principal would require acceleration and notice of acceleration.

Shortly thereafter, in February 2008, Mathis made three payments, with each installment in the amount of $2,601.28. Each payment was accepted by DCR. Then, in April 2008, Mathis once again made three payments to DCR ($2,601.28 each) and all three were accepted by DCR.

According to Amano's testimony, in the third or fourth quarter of 2008, the partners of DCR decided that DCR would no longer accept monthly installments from Mathis and that it would proceed with foreclosure. Amano acknowledged that he did not tell Mathis that DCR would no longer accept monthly payments. Amano admitted that he did not have a good answer as to why he did not tell Mathis that DCR would no longer accept monthly payments.

### 4. Mathis Learns From CDC That DCR Intends to Initiate Foreclosure Proceedings (January 2009)

In January 2009, Mathis learned from Ms. Rios Valdez that CDC had received correspondence from Amano asking CDC to acquiesce to DCR's initiation of foreclosure proceedings. That correspondence included a draft of a "proposed" foreclosure notice, which CDC had provided to Mathis. Mathis reviewed DCR's correspondence to CDC and noticed its recitation that the note had been accelerated. Mathis testified he was surprised and that after checking his files, he remained "quite sure" he had not received a notice of acceleration.

On January 22, 2009, Mathis wrote to Amano informing him that he had received a copy of a "proposed" foreclosure notice, which Amano had sent to CDC. Disputing that the note had been accelerated, Mathis asked for evidence of acceleration. Amano did not reply to Mathis's letter.[11]

---

[11] CDC also sent an e-mail to Amano on February 12, 2009 informing him that Mathis was unaware of any acceleration. Amano did not reply to the e-mail.

***5. Mathis's Attempts to Bring the Note Current and DCR's Notice to Mathis of a May 2009 Foreclosure Sale (February 2009 through April 2009)***

On February 25, 2009, Mathis mailed a check to DCR for three installment payments. These payments were eventually returned but not until weeks later. In fact, Amano did not return the check until April 29, 2009, the day Mathis filed this suit.

Meanwhile, Mathis tendered a payment for $52,025.60, the total amount of installments that had not been paid as of that date. Payment was issued in the form of a cashier's check, mailed by Mathis's attorney on April 8, 2009 via U.S. Express Mail and received by DCR on April 9, 2009. According to Mathis, he was completely unaware that DCR had accelerated the note, and that through April 9, 2009, he believed that no acceleration had occurred. Prior to April 10, 2009, Amano had never told him DCR would not accept late payments or anything other than full payment of the note.

On April 10, 2009, Amano/DCR appointed attorney Jeffrey Walsh as the substitute trustee under the deed of trust. That same day, Walsh signed a foreclosure notice stating that a foreclosure sale was to take place on May 5, 2009. Two days later, Amano sent a letter to Mathis and his attorney requesting, in part, that certain identified tax loans be immediately removed and stating that such loans amounted to a failure to preserve DCR's priority as required by the terms of the deed of trust. According to the letter, the note had been accelerated by an "Acceleration Notice" sent on February 19, 2007.[12] On April 13, 2009, Walsh sent Mathis copies of the paperwork appointing him as substitute trustee and of the foreclosure notice for May 5, 2009. Mathis's attorney responded by e-mailing Walsh on April 14, 2009 requesting any documentation evidencing an acceleration. Walsh did not respond.

---

[12] The April 12 letter also referenced an attached copy of the February 19, 2007 notice as well as a copy of a "Loan Statement." However, no documents were attached to either Mathis's version or his attorney's version.

***Mathis's Suit For Declaratory Judgment And Temporary Injunction***

On April 29, 2009, Mathis filed a declaratory judgment action requesting the court to "declare the status of, and the parties' relative rights under," the note. Mathis also sought a temporary injunction to enjoin DCR from going forward with the foreclosure sale. The trial court held a hearing on Mathis's application for temporary injunction, and subsequently issued an order that conditionally granted Mathis's request.[13]

***The Hearing and The Trial Court's Final Judgment***

On March 2, 2010, the trial court held a hearing on the matter. That same day, judgment was entered in favor of DCR. The trial court determined that the note had been accelerated and that DCR was entitled to foreclose the deed of trust lien. The trial court also awarded DCR attorney's fees and ordered the court clerk to pay to DCR some $105,728.16 which had been deposited by Mathis into the registry of the court pending suit.[14]

***Findings of Fact and Conclusions of Law***

On June 30, 2010, in response to a request by Mathis, the trial court filed Findings of Fact and Conclusions of Law. Subsequently, the trial court entered amended the previous Findings of Fact and Conclusions of Law. As amended the trial court's findings and conclusions read as follows:

## I. FINDINGS OF FACT

1. Mathis executed a Note and Deed of Trust in favor of Norwest Bank, concerning commercial real property at 2200 Tillery Street, Austin, Texas 78723 (the 'Property') on March 31, 2000.

---

[13] The trial court's temporary injunction ordered that Mathis pay the tax loans. However, it did condition the continued effectiveness of the temporary injunction after August 3, 2009 upon the tax loans' being paid on or before that date. The tax loans were paid and the liens securing them released before August 3, 2009.

[14] The $105,728.16 was primarily comprised of installment payments which had become due on the note.

2. DCR acquired the Mathis Note and Deed of Trust on or about September 15, 2006 and is the current owner and holder of the Note and Deed of Trust.

3. The Note required Mathis to make monthly payments on the 15th of each month until September 15, 2020. After default, the holder of the Note could credit payment in whatever lawful manner it chose. Per the Note, matured, unpaid principal and interest shall bear interest as the maximum rate allowed by law. Upon payment or other default, the holder of the Note could accelerate the maturity of all indebtedness owed. Mathis waived all notices, including, notice of intent to accelerate and notice of acceleration. Further, the parties agreed that, no waiver by the lender shall be effective unless made in a signed written document.

4. The Deed of Trust expressly required Mathis to pay all taxes and assessments on the Property when due and to preserve the lien's priority. The Deed of Trust required Mathis to maintain property insurance and deliver policy renewals to the lender at least ten days before the policy's expiration. Additionally, Mathis was required to obtain life insurance and assign the policy to lender. Mathis assigned all present and future rental income and receipts from the Property to the lender.

5. Pursuant to the Addendum to the Deed of Trust and Assignment of Rents and Other Income, Mathis agreed to indemnify the lender from any and all claims, losses, and liabilities except for those resulting from gross negligence or willful misconduct. Additionally, Mathis is responsible for all of the lender's expenses, incurred in connection with the loan.

6. Unbeknownst to DCR, Mathis entered into a subrogated loan to pay for property taxes on the Property in December 2006, eliminating DCR's first lien priority on the Property.

7. Mathis failed to timely make payments due under the Note starting in September 2006.

8. In early 2007, DCR requested that Mathis assign his life insurance policy as required by the Note. Mathis never responded or provided the assignment. Mathis failed to provide insurance policy renewals to lender. Mathis has failed to convey rental and other proceeds from the Property to DCR.

9. On February 19, 2007, although no notice was required, DCR sent Mathis a letter indicating that it had accelerated the amount owed under the Note.

10. Prior to February 19, 2007, several late payments had been made and accepted by the prior Note holder and DCR.

11. The Note was properly accelerated.

12. In early 2007, Mathis represented to DCR that he was attempting to sell the Property with the proceeds used to payoff the Note.

- 11 -

13. DCR representative Lance Amano ('Amano'), met with Mathis on or about February 2007, wherein Amano, due to Mathis' default, acceleration of the note, and Mathis' requests for time to sell the Property, demanded a forbearance agreement.

14. Amano repeated his demand for a forbearance agreement numerous times during 2007 and 2008, while Mathis attempted to sell the Property.

15. Unbeknownst to DCR, Mathis applied for, and obtained an additional loan to pay for property taxes on the Property, further jeopardizing DCR's lien position.

16. In early 2008, Mathis defaulted multiple times on his payment obligations for the tax loans on the Property.

17. On January 15, 2009, DCR notified BCL of Texas ('BCL'), a secondary lien holder on the property, of its intent to foreclose on the Property. BCL forwarded this letter to Mathis.

18. Mathis colluded with Rosa Rios Valdez with BCL of Texas to delay DCR's attempts to foreclose on the Property and in an attempt to negotiate a lesser sum owed under the Note.

19. Mathis arranged for BCL of Texas to hire an attorney to intervene in this lawsuit and assist in attempts to enjoin foreclosure on the Property, and paid for BCL of Texas' attorney's fees for that representation.

20. Mathis urged BCL of Texas to refrain from buying-out DCR's Note and lien position on the Property based on a concern that Mathis would lose his attorney's fees and DCR would attempt to come after him for DCR's attorney's fees.

21. On April 8, 2009, with knowledge of DCR's intent to foreclose on the Property, Mathis tendered partial payment under the Note. Mathis' partial payment was returned by DCR as insufficient.

22. On April 12, 2009, DCR via a letter, again notified Mathis of his breaches of the Note and Deed of Trust due to the tax liens and demanded Mathis remedy the failure immediately, and advised that the partial payment was insufficient. Mathis failed to remedy the tax lien issue immediately, and did not have the liens removed until the Court ordered him to do so.

23. On April 13, 2009, DCR gave Mathis notice of intent to conduct a Substitute Trustee's Sale on May 5, 2009.

24. On April 29, 2009 Mathis initiated this litigation seeking to enjoin DCR's foreclosure of the Property.

25. The amount due under the Note is $444,694.25.

26. DCR has incurred reasonable and necessary attorney's fees in the amount of $78,375.00, and costs in the amount of $4,111.77 in defending its interest in the Note and Deed of Trust in this lawsuit.

[27.] All findings of fact that would be more appropriately classified as conclusions of law are hereby adopted as such.

## II. CONCLUSIONS OF LAW

1. Venue and jurisdiction is proper in Travis County, Texas.

2. No notice of intent to accelerate or notice of acceleration was required under the terms of the Note. Waivers of notices are enforceable.

3. DCR accelerated the total amount owed under the Note on February 19, 2007.

4. By allowing Mathis time to attempt to sell the Property, and by accepting infrequent partial payments, DCR did not waive its rights to enforce the terms of the Note or acceleration of same.

5. Mathis breached the Note and Deed of Trust, by, among other things, failure to make payments as and when owed, obtaining priority tax liens eliminating DCR's lien priority, failure to pay the accelerated amount, failure to assign his life insurance policy to DCR, failure to provide insurance policy renewals, and failure to convey lease payments and other proceeds on the Property to DCR.

6. The Deed of Trust from Mathis to DCR on the Property creates a lien in favor of DCR, securing Mathis' payment obligations under the Note.

7. DCR satisfied all conditions precedent to foreclosing on the Property under the Deed of Trust.

8. The Note is in default.

9. DCR is entitled to foreclose on the Property pursuant to the Deed of Trust.

10. DCR is entitled to recover reasonable and necessary attorney's fees from Mathis, in the amount of $78,375.00, and costs in the amount of $4,111.77 for preparation and trial; $15,000.00 if the case is appealed to the Court of Appeals, and $10,000.00, if the case is appealed to the Texas Supreme Court.

11. All conclusions of law that would be more appropriately classified as findings of fact are hereby adopted as such.

*The Appeal*

In Issues One through Seven, Mathis complains that the trial court erred in denying his request for declaratory relief. The majority of his contentions are challenges to the legal and factual sufficiency of the evidence to support the trial court's fact findings.

**STANDARD OF REVIEW**

A trial court's findings of fact have the same force and dignity as a jury verdict. *City of Clute v. City of Lake Jackson*, 559 S.W.2d 391, 395 (Tex.Civ.App.--Houston [14th Dist.] 1977, writ ref'd n.r.e.). We apply the same standards in reviewing the legal or factual sufficiency of the evidence supporting the trial court's fact findings as we do when reviewing the legal or factual sufficiency of the evidence supporting a jury's answer to a jury question. *Ashcraft v. Lookadoo*, 952 S.W.2d 907, 910 (Tex.App.--Dallas 1997), *pet. denied by* 977 S.W.2d 562 (Tex. 1998); *Okon v. Levy*, 612 S.W.2d 938, 941 (Tex.Civ.App.--Dallas 1981, writ ref'd n.r.e.).

When an appellant attacks the legal sufficiency of the evidence to support an adverse finding on an issue upon which it did not have the burden of proof, such as an affirmative defense, the appellant must demonstrate that there is no evidence to support the adverse finding. *Lochinvar Corp. v. Meyers*, 930 S.W.2d 182, 189 (Tex.App.--Dallas 1996, no writ). In reviewing a "no evidence" or legal sufficiency point, we consider only the evidence favorable to the decision of the trier of fact and disregard all evidence and inferences to the contrary. *Davis v. City of San Antonio*, 752 S.W.2d 518, 522 (Tex. 1988); *Garza v. Alviar*, 395 S.W.2d 821, 823 (Tex. 1965). If any evidence of probative force supports the finding, an appellate court will uphold the trier of fact's finding. *Juliette Fowler Homes, Inc. v. Welch Assocs., Inc.*, 793 S.W.2d 660, 666 (Tex. 1990). A no evidence point of error may only be sustained when the record discloses one of the following: (1) a complete absence of evidence of a vital fact; (2) the court is

barred by rules of law or evidence from giving weight to the only evidence offered to prove a vital fact; (3) the evidence offered to prove a vital fact is no more than a mere scintilla of evidence; or (4) the evidence establishes conclusively the opposite of a vital fact. *Id*. at 666 n.9. When we sustain a no evidence point, it is our duty to render judgment for the appellant because that is the judgment the trial court should have rendered. *F.D.I.C. v. F & A Equip. Leasing*, 854 S.W.2d 681, 685 (Tex.App.--Dallas 1993, no writ).

Although a trial court's conclusions of law may not be challenged for factual insufficiency, the trial court's conclusions drawn from the facts may be reviewed to determine their correctness. *Mercer v. Bludworth*, 715 S.W.2d 693, 697 (Tex.App.--Houston [1st Dist.] 1986, writ ref'd n.r.e.), *overruled on other grounds by Shumway v. Horizon Credit Corp.*, 801 S.W.2d 890 (Tex. 1991); *see City of Dallas v. Villages of Forest Hills*, 931 S.W.2d 601, 605 (Tex.App.--Dallas 1996, no writ).

## ACCELERATION

In his first four points of error, Mathis argues the evidence was legally and/or factually insufficient to support various findings by the trial court with respect to DCR's acceleration of the debt. It is clear that the holder of a note must ordinarily give notice to the maker of the holder's intent to accelerate the time for payment as well as notice of acceleration. *Shumway*, 801 S.W.2d at 892; *Ogden v. Gibraltar Savs. Ass'n*, 640 S.W.2d 232, 233-34 (Tex. 1982); *Parker v. Frost National Bank of San Antonio*, 852 S.W.2d 741, 744 (Tex.App.--Austin 1993, writ dism'd by agr.). It is also well settled that the maker may waive his right to notice of intent to accelerate and notice of acceleration. *Shumway*, 801 S.W.2d at 893; *Phillips v. Allums*, 882 S.W.2d 71, 73-74 (Tex.App.--Houston [14th Dist.] 1994, writ denied). Such waivers are effective if they are contained in *either* a note or a deed of trust. *Parker*, 852 S.W.2d at 744; *see*

*also Mercer*, 715 S.W.2d at 699; *Chapa v. Herbster*, 653 S.W.2d 594, 601 (Tex.App.--Tyler 1983, no writ), *overruled on other grounds by Shumway v. Horizon Credit Corp.*, 801 S.W.2d 890 (Tex. 1991). The reasoning behind this rule is that to require that every instrument executed in conjunction with a promissory note contain the necessary language would be "unnecessarily duplicative." *See Dolci v. Askew*, No. 04-95-00867-CV, 1997 WL 428560, at *2 (Tex.App.--San Antonio, July 30, 1997)(not designated for publication), *citing Parker*, 852 S.W.2d at 744.

Regardless of whether the waiver appears in the note or the deed of trust, the waiver must be "clear and unequivocal." *See Dolci,* 1997 WL 428560, at *2, *citing Shumway*, 801 S.W.2d at 893. A waiver is clear and unequivocal if it states specifically and separately the rights surrendered. *Shumway*, 801 S.W.2d at 893.

### What Was Required To Properly Accelerate The Note?

Mathis claims that the trial court erred in finding that "Mathis waived all notices, including, notice of intent to accelerate and notice of acceleration." Mathis recognizes the following waiver provision in the note is sufficient to show a clear and unequivocal intent to waive both notice of intent to accelerate and notice of acceleration:

> Each of Makers, each guarantor of any of the Indebtedness, and each person who grants any lien or security interest to secure payment of any of the Indebtedness, (i) except as expressly provided herein, waives all notices (including, without limitation, notice of intent to accelerate, notice of acceleration and notice of dishonor), demands for payment, presentment, protest and diligence in bringing suit and in the handling of any security . . . .

But he argues that when read together as a single instrument, the note and the deed of trust do not demonstrate "a clear and unequivocal waiver of the maker's right to receive notice of the holder's intent to accelerate maturity of the note." In support of his argument he relies on the following provision from the deed of trust:

5. If Grantor defaults on the note or fails to perform any of Grantor's obligations or if default occurs on a prior lien note or other instrument, and the default continues after Beneficiary gives Grantor notice of the default and the time within which it must be cured, as may be required by law or by written agreement, then Beneficiary may:

a. declare the unpaid principal balance and earned interest on the note immediately due. . . .

Mathis contends that "[t]he subject note and deed of trust should of course be read together in a single instrument and construed together," and, that when read together, the additional language contained in the deed of trust renders the waiver ineffective.

Mathis relies heavily upon the San Antonio Court of Appeals' decision in *Dolci v. Askew*, where the deed of trust contained a provision almost identical to the one here. *See Dolci,* 1997 WL 428560, at *2. The note included the following provisions:

If Maker defaults in the payment of this note or in the performance of any obligation in any instrument securing or collateral to it, and the default continues after Payee gives Maker notice of the default and the time within it must be cured, as may be required by law or by written agreement, then Payee may declare the unpaid principal balance due and earned interest on this note immediately due. Maker and each surety, endorser, and guarantor waive all demands for payment, presentations for payment, notices of intention to accelerate maturity, notices of acceleration of maturity, protests, and notices of protest, to the extent permitted by law.

*Id*. The trial court found that "Dolci's attempted foreclosure was improper because Dolci was required to give Askew notice and an opportunity to cure any alleged default prior to acceleration and foreclosure." *Id*. at *3 n.1. On appeal, Dolci argued that the waiver language in the note alone was sufficient to relieve him of his duty to give notice and an opportunity to cure.[15] *Id*. At *2.

---

[15] The court provided the following summary of Dolci's argument:

- 17 -

The San Antonio court affirmed, acknowledging that:

Although it is clear that the presence of waiver language in the Note would ordinarily be sufficient even though it was not contained in the Deed of Trust, and though the waiver clause in the Note, when read in a vacuum, is sufficiently clear, when the Note is read as a whole, we cannot agree that the waiver is clear and unequivocal.

*Id*. at *3. Focusing on a reading of the note, "as a whole," the court reasoned that:

Reading the waiver clause contained in the note in conjunction with the sentence it follows, it is not difficult to imagine how confusion could arise as to whether Askew actually waived his right to notice of default and an opportunity to cure. The sentence immediately preceding the waiver language states that Dolci may accelerate the note only if Askew defaults in payment of the note 'and the default continues after [Dolci] gives [Askew] notice of the default and the time within which it must be cured, as may be required by law or written agreement.' While Dolci argues that the 'as may be required by law' language in this clause resolves any inconsistencies in the two sentences because the law allows makers to waive their right to notice, we cannot agree that this language eliminates all ambiguity regarding waiver in this case.

*Id*. The court then reiterated the general rule that, "[i]f a reasonable doubt exists as to the meaning of terms used in an acceleration clause, preference should be given to that construction which will avoid forfeiture and prevent acceleration of maturity." *Id*. (internal quotations omitted), *quoting Prunell v. Follett*, 555 S.W.2d 761, 764 (Tex.Civ.App.--Houston [14th Dist.] 1977, no writ). Thus, the waiver was ineffective because it was not clear and unequivocal. *Id*.

Here, the note and the deed of trust must be construed together because they were executed by the same parties on the same day, they pertain to the same real property, each

He contends that the Note and Deed of Trust should be read together and that, when read together, the two documents require notice and an opportunity to cure only when required by law or written agreement. Dolci concludes that notice was not required in this case because applicable law only requires notice in the absence of an effective waiver, there was no written agreement between the parties regarding notice, and Askew expressly waived his right to notice in the Note. *Dolci,* 1997 WL 428560, at *2.

- 18 -

document references the other, and the deed of trust is identified as the security for the note. *Adams v. First National Bank of Bells/Savoy*, 154 S.W.3d 859, 868 (Tex.App.--Dallas 2005, no pet.), *citing The Cadle Co. v. Butler*, 951 S.W.2d 901, 909 (Tex.App.--Corpus Christi 1997, no pet.). The rules of interpretation that apply to contracts also apply to notes and deeds of trust. *Starcrest Trust v. Berry*, 926 S.W.2d 343, 352 (Tex.App.--Austin 1996, no writ); *see also Sonny Arnold, Inc. v. Sentry Savings Assoc.*, 633 S.W.2d 811, 815 (Tex. 1982)(a mortgage is governed by the same rules of interpretation that apply to contracts); *Edlund v. Bounds*, 842 S.W.2d 719, 726 (Tex.App.--Dallas 1992, writ denied)("It is well established in Texas that the rules of construction governing contracts are applicable to notes, and a note must be constructed as a whole."). A court's primary duty in construing a note and deed of trust, as when construing a contract, is to ascertain the parties' intent from the instrument's language. *See Coker v. Coker*, 650 S.W.2d 391, 393 (Tex. 1983). In ascertaining the drafter's intent, the court must examine the document as a whole and strive to give every part of it effect. *See id.*; *Forbau v. Aetna Life Ins. Co.*, 876 S.W.2d 132, 133 (Tex. 1994). Words should be given their plain meaning based on the way they are used, unless it appears that doing so would defeat the intention of the parties. *See Reilly v. Rangers Management, Inc.*, 727 S.W.2d 527, 529 (Tex. 1987), *citing Fox v. Thoreson*, 398 S.W.2d 88, 92 (Tex. 1966).

Under the Supreme Court's holding in *Shumway,* the waiver language in the note would be considered a "clear and unequivocal" waiver of both notice of intent to accelerate and notice of acceleration. If the deed of trust were silent on the issue, the waiver would be valid and enforceable. But the deed of trust is not silent. Acceleration is not favored in the law. *Mastin v. Mastin*, 70 S.W.3d 148, 154 (Tex.App.--San Antonio 2001, no pet.); *see also Burns v. Stanton*, 286 S.W.3d 657, 661 (Tex.App.--Texarkana 2009, pet. denied)(noting that "[B]ecause

acceleration of a debt is viewed as a harsh remedy, . . . any such clause will be strictly construed"). In fact, under Texas law, we apply strict scrutiny to acceleration provisions, and if any reasonable doubt exists as to the parties' intent, we resolve such doubt against acceleration.

The deed of trust creates a reasonable doubt as to whether the parties clearly and unequivocally intended to waive notice of default and time to cure, which amounts to notice of intent to accelerate. It is undisputed that there was no notice of intent to accelerate and time to cure. Because there was not an effective waiver of notice of intent to accelerate, acceleration was void as a matter of law.[16] We sustain Issues One, Two, Three, and Four. It is unnecessary that we consider the remainder.

## CONCLUSION

Since DCR did not give proper notice of its intent to accelerate the debt, we hold that any attempted acceleration was ineffective. *See Ogden*, 640 S.W.2d at 234. We reverse and remand the cause to the trial court to determine the final computations, provide for disbursements, and render the entry of a judgment in accordance with this opinion.


October 10, 2012
_____
ANN CRAWFORD McCLURE, Chief Justice


Before McClure, C.J., Rivera, and Antcliff, JJ.

---

[16] Just as did the court in *Ogden*, we too "do not decide whether, after proper notice of intent to accelerate, a notice of trustee's sale is sufficient to give notice that the debt has been accelerated." *See Ogden*, 640 S.W.2d at 234.