

# In the Missouri Court of Appeals
## Eastern District
### DIVISION THREE

| | | |
|---|---|---|
| STATE OF MISSOURI, | ) | No. ED99778 |
| | ) | |
| Respondent, | ) | |
| | ) | Appeal from the Circuit Court of the |
| vs. | ) | City of St. Louis |
| | ) | |
| MICHAEL SUTHERLAND, | ) | Honorable John F. Garvey |
| | ) | |
| Appellant. | ) | Filed: April 29, 2014 |

## I. INTRODUCTION

Michael Sutherland (Defendant) appeals the judgment of conviction entered by the Circuit Court of the City of St. Louis after a jury found him guilty of second-degree domestic assault, section 565.073,[1] and third-degree domestic assault, section 565.074. Defendant claims the trial court erred in denying his: (1) motions for judgment of acquittal because the evidence was insufficient to support his conviction of second-degree domestic assault for choking C.K.; and (2) request for a continuance. We affirm.

## II. FACTUAL AND PROCEDURAL BACKGROUND

Viewed in the light most favorable to the verdict, the evidence at trial revealed that Defendant and C.K. had an on-and-off romantic relationship. On the morning of Thursday, August 5, 2010, after having spent the night together, Defendant and C.K. began arguing about

---

[1] All statutory references are to RSMo (Supp. 2009), the version of the revised statutes in effect when the offenses occurred.

whether C.K. had sex with another man. C.K. left Defendant's house to walk to the Amtrak station, but she called Defendant for a ride when she realized she did not have enough money for the train. Defendant and C.K. resumed arguing when Defendant arrived. On the way back to his house, Defendant told C.K. if she did not tell the truth about sleeping with another man, he would get his gun out. Defendant punched C.K. in the face and side at least eleven times when she would not respond to him. When they arrived at Defendant's house, C.K. tried to run away but Defendant caught her. They went inside Defendant's house, where C.K. stayed the rest of Thursday and all day Friday. During that time, Defendant and C.K. did not argue.

On Saturday, C.K. drove Defendant's car to the grocery store and called a friend to report she would be coming home that day. When C.K. returned to Defendant's house, Defendant started another argument with her about the other man. During this argument, Defendant held C.K. up against a wall by her neck and squeezed her neck with his hand. Defendant stopped when someone knocked on the door. As Defendant went to answer it, C.K. ran out the back door and found a police officer.

The State charged Defendant with one count of second-degree domestic assault for attempting to cause physical injury to C.K. by choking her. The State also charged Defendant with one count of third-degree domestic assault for striking C.K. and one count of unlawful use of a weapon. The trial court scheduled a jury trial.

On May 15, 2012, Defendant filed a motion to continue the May 16 trial setting. Defendant alleged C.K. had failed to attend scheduled depositions during the pendency of the case. Defendant stated that on Monday, May 14, 2012, he learned the prosecutor, who had been unable to contact C.K., located her on Friday, May 11. Defendant claimed he conducted an interview with C.K. on May 14 that lasted nearly two hours and "resulted in the names and

2

contact information of possible witnesses . . . and a story somewhat different than what appeared in the police reports." Defendant alleged the changes in C.K.'s story were "material to the defense and must be further investigated." Defendant did not identify the possible witnesses or the alleged changes in C.K.'s story. Defendant stated he was scheduled to depose C.K. on May 15, the day before trial. The trial court denied Defendant's motion for a continuance because: "The parties have had sufficient time to prepare. No real prejudice to Defendant shown in aftermath of 5/15/12 victim deposition."

The trial court conducted a jury trial. The State presented C.K.'s testimony, among other evidence. Defendant filed motions for judgment of acquittal at the close of the State's evidence and the close of all evidence. The trial court denied both motions.

The jury found Defendant guilty on both domestic assault counts but not guilty on the unlawful use of a weapon count. For the third-degree domestic assault offense, the trial court sentenced Defendant to thirty days' confinement with credit for time served. For the second-degree domestic assault offense, the trial court sentenced Defendant to seven years' imprisonment but suspended execution of the sentence and placed Defendant on probation for two years. The trial court later found Defendant violated a condition of his probation. The trial court revoked Defendant's probation and ordered execution of the seven-year prison sentence. Defendant appeals.

### III. DISCUSSION

### A. Sufficiency of the Evidence – Second-Degree Domestic Assault

In his first point on appeal, Defendant argues the trial court erred in denying his motions for judgment of acquittal because the evidence was insufficient to support his conviction of second-degree domestic assault. More specifically, Defendant maintains the State failed to prove

Defendant attempted to cause C.K. physical injury by choking her because "all of the testimony at trial indicated that there was no obstruction of C.K.'s windpipe and that she was able to breathe freely." We disagree.

"[T]his Court's review of the sufficiency of the evidence is limited to whether the State has introduced sufficient evidence for any reasonable juror to have been convinced of the defendant's guilt beyond a reasonable doubt." *State v. Nash*, 339 S.W.3d 500, 508-09 (Mo. banc 2011). "This is not an assessment of whether the Court believes that the evidence at trial established guilt beyond a reasonable doubt but rather a question of whether, in light of the evidence most favorable to the State, any rational fact-finder could have found the essential elements of the crime beyond a reasonable doubt." *Id.* at 509 (quotation omitted). We accept as true all evidence favorable to the State, including all favorable inferences drawn from the evidence, and we disregard all evidence and inferences to the contrary. *Id.*

"When reviewing the sufficiency of evidence supporting a criminal conviction, the Court does not act as a 'super juror' with veto powers, but gives great deference to the trier of fact." *Id.* (quotation omitted). "This Court will not weigh the evidence anew since the fact-finder may believe all, some, or none of the testimony of a witness when considered with the facts, circumstances and other testimony in the case." *Id.* (quotation omitted). "An appellate court faced with a record of historical facts that supports conflicting inferences must presume—even if it does not affirmatively appear in the record—that the trier of fact resolved any such conflicts in favor of the prosecution, and must defer to that resolution." *State v. Chaney*, 967 S.W.2d 47, 53 (Mo. banc 1998) (quotation omitted).

Here, the State charged Defendant with second-degree domestic assault for attempting to cause physical injury to C.K. by choking her. A person commits the crime of second-degree

domestic assault if he or she "[a]ttempts to cause . . . physical injury to [a] family or household member by any means, including but not limited to . . . by choking or strangulation . . . ." Mo. Rev. Stat. § 565.073.1(1). However, the term "choking" is not defined by statute.

"In the absence of a statutory definition, words will be given their plain and ordinary meaning as derived from the dictionary." *State v. Oliver*, 293 S.W.3d 437, 446 (Mo. banc 2009). The dictionary defines the verb "choke" as follows: "1: to make normal breathing difficult or impossible for (a person or animal) (1) by compressing the throat with strong external pressure . . . ." WEBSTER'S THIRD NEW INTERNATIONAL DICTIONARY 396 (1976); *see AAA Laundry & Linen Supply Co. v. Dir. of Revenue*, No. SC93331, 2014 WL 946930, at *5 (Mo. banc Mar. 11, 2014) (citing *Webster's Third New International Dictionary* as the court's "dictionary of choice").[2]

Viewing the evidence in the light most favorable to the State, there was sufficient evidence to allow a reasonable juror to find Defendant guilty beyond a reasonable doubt of attempting to cause C.K. physical injury by choking her. C.K. testified as follows:

Q. Did he do anything else to you at that point?

A. Yeah, I mean, he tried choking me with his hand, and then that's when –

Q. When you say he tried choking you with his hand, what specifically did he do?

A. He held me up against the wall with his hand. By my neck.

---

[2] In *State v. Ondo*, 232 S.W.3d 622 (Mo. App. S.D. 2007), the court stated that "[c]hoking is defined as 'producing the feeling of strangulation.'" 232 S.W.3d at 628 (quoting MERRIAM-WEBSTER'S COLLEGIATE DICTIONARY 218 (11th ed. 2005)). The court noted: "Grabbing a person by the throat no doubt produces the feeling of strangulation." *Id.* However, the defendant in *Ondo* did not argue on appeal that his conduct was insufficient to constitute choking for purposes of section 565.073. *See id.* at 624. Thus, the *Ondo* court did not address the issue in this appeal—the degree to which a victim's breathing must be obstructed to support a conviction of second-degree domestic assault. Accordingly, we do not find *Ondo* instructive for purposes of this opinion.

5

Q. So he had a hand on your neck, and you said he held you up against the wall?

A. Uh-huh.

Q. Is that a yes?

A. Yes.

Q. How did you feel when he was holding you up against the wall?

A. Scared.

Q. Were you able to breathe at that point?

A. Yeah, I was able to breathe. I mean, I didn't lose consciousness, but . . .

Q. Okay. Did you feel, though, that he was actually squeezing your neck –

A. Yes.

Q. – or was he just holding it?

A. No, he was squeezing it.

Q. Okay. So he was actually choking you at that point.

A. Uh-huh.

Q. Is that a yes?

A. Yes.

Given C.K.'s testimony that Defendant held her up against a wall by her neck and squeezed her neck, a reasonable juror could have inferred Defendant made C.K.'s normal breathing difficult by compressing the throat with strong external pressure. In addition, C.K. characterized Defendant's conduct as choking. Therefore, the State introduced sufficient evidence for a reasonable juror to have been convinced of Defendant's guilt.

Defendant argues choking requires an obstruction of airflow through the windpipe and "all of the testimony at trial indicated that there was no obstruction of C.K.'s windpipe and that

she was able to breathe freely." We disagree. As discussed above, "choke" means "to make normal breathing *difficult or impossible*." WEBSTER'S THIRD NEW INTERNATIONAL DICTIONARY 396 (1976) (emphasis added). Thus, Defendant could have choked C.K. without completely obstructing her windpipe. Moreover, although C.K. stated she could breathe, she never said she could "breathe freely." C.K. also testified Defendant squeezed her neck and held her up against a wall by her neck. A reasonable juror could have easily inferred those actions made C.K.'s breathing *difficult* (though not impossible). We must accept as true all favorable inferences drawn from the evidence. *Nash*, 339 S.W.3d at 509.

Finally, Defendant contends C.K.'s testimony that she never felt lightheaded proves she was not choked. Defendant relies on his assertion that "a state of restricted air or blood flow would result in lightheadedness." However, Defendant cites no authority or evidence in the record to support that proposition. Accordingly, we decline to adopt Defendant's suggestion that choking requires a feeling of lightheadedness in all cases. We hold the evidence was sufficient to support Defendant's conviction of second-degree domestic assault for choking C.K. Point one is denied.

### B. Defendant's Motion for Continuance

In his second point on appeal, Defendant asserts the trial court erred in denying his request for a continuance based on the fact that he was unable to depose C.K. until the day before trial. Defendant argues that by denying a continuance, the trial court forced him to proceed to trial with a lawyer who was not sufficiently prepared. We disagree.

"The decision to grant a continuance is within the sound discretion of the trial court." *State v. Salter*, 250 S.W.3d 705, 712 (Mo. banc 2008). "Reversal is not warranted unless there is a very strong showing that there was an abuse of discretion resulting in prejudice." *Id.* "We will

reverse the circuit court's denial of a continuance only when the circuit court abuses its discretion by entering a ruling that is clearly illogical and is arbitrary and unreasonable." *State v. Lumpkins*, 348 S.W.3d 135, 140 (Mo. App. W.D. 2011) (quotation omitted). A trial court may properly deny a continuance requested to conduct investigation to counter witness testimony where the defendant neither identifies a witness who can testify as he desires nor asserts particular facts to which the unknown witness he hopes to find will testify. *See State v. Lucas*, 218 S.W.3d 626, 629-30 (Mo. App. S.D. 2007).

On May 15, 2012, Defendant filed a motion to continue the May 16 trial setting. Defendant alleged C.K. had failed to attend scheduled depositions during the pendency of the case. Defendant stated that on Monday, May 14, 2012, he learned the prosecutor, who had been unable to contact C.K., located her the previous Friday. Defendant claimed he conducted an interview with C.K. on May 14 that lasted nearly two hours and "resulted in the names and contact information of possible witnesses . . . and a story somewhat different than what appeared in the police reports." Defendant alleged the changes in C.K.'s story were "material to the defense and must be further investigated." Defendant stated he was scheduled to depose C.K. on May 15, the day before trial. The trial court denied Defendant's motion because: "The parties have had sufficient time to prepare. No real prejudice to Defendant shown in aftermath of 5/15/12 victim deposition."

Defendant has failed to make the required very strong showing of an abuse of discretion resulting in prejudice. As to the "possible witnesses" Defendant hoped to investigate, he did not identify them despite his claim that he learned their names and contact information in the May 14 interview with C.K. that lasted nearly two hours. Further, Defendant did not state what these witnesses' testimony would be and how it would aid his defense. *See id.* Defendant also failed

8

to explain to the trial court how C.K.'s story had materially changed or how further investigation would aid or change his defense in any way. *See State v. Fassero*, 307 S.W.3d 669, 676 (Mo. App. E.D. 2010). Thus, the trial court did not err in denying Defendant's request for a continuance.

Relying on *State v. Whitfield*, 837 S.W.2d 503 (Mo. banc 1992), and *State v. Zetina-Torres*, 400 S.W.3d 343 (Mo. App. W.D. 2013), Defendant maintains the trial court erred in denying a continuance because he was surprised by new evidence at the last minute. Both *Whitfield* and *Zetina-Torres* are inapposite because they involved discovery violations by the State that prejudiced the defense. *See Whitfield*, 837 S.W.2d at 506-08 (State's late notification of evidence it intended to use at trial prejudiced the defendant); *Zetina-Torres*, 400 S.W.3d at 354-57 (multiple late disclosures by the State "culminated in an entirely new theory, the absence of which would have cast considerable doubt on the sufficiency of the evidence in the case"). Here, by contrast, Defendant does not claim the State failed to make C.K. available or otherwise committed a discovery violation. It appears even the prosecutor had difficulty staying in contact with C.K. Moreover, as discussed above, Defendant did not explain why the information he gained from interviewing C.K. was surprising or how further investigation would aid his defense. Point two is denied.

# IV. CONCLUSION

The judgment of the trial court is affirmed.

_Angela T. Quigless_
Angela T. Quigless, Judge

Mary K. Hoff, Presiding Judge, concurs and
Kurt S. Odenwald, Judge, dissents in separate opinion.

10



# In the Missouri Court of Appeals
# Eastern District

## DIVISION III

STATE OF MISSOURI, ) No. ED99778
)
    Respondent, ) Appeal from the Circuit Court
) of City of St. Louis
vs. )
) Honorable John F. Garvey, Jr.
MICHAEL SUTHERLAND, )
)
    Appellant. ) FILED: April 29, 2014

### Dissent

I respectfully dissent with the majority's holding that sufficient evidence was before the trial court to support a conviction of second-degree domestic assault. My difference from the majority opinion focuses on the evidence of choking, or, in my conclusion, the absence of such evidence, even in light of our limited standard of review.

The majority correctly states our standard of review that when reviewing a claim based upon the sufficiency of the evidence, we view the evidence in the light most favorable to the State, State v. Nash, 339 S.W.3d 500, 508-09 (Mo. banc 2011) and accept as true all evidence and inferences favorable to the State and disregard all evidence and inferences to the contrary. State v. Page, 309 S.W.3d 368, 375 (Mo. App. E.D. 2010).

The evidence introduced at trial is that Defendant Sutherland ("Sutherland") held C.K. up against a wall by her neck and squeezed her neck. C.K. initially stated Sutherland tried to choke her, and subsequently answered "Uh-huh" when the prosecutor asked if "he was actually choking you at that point." Despite Sutherland's actions, C.K. testified on cross-examination that she could breathe. The majority concludes that a reasonable jury could have inferred from C.K.'s testimony that her breathing was made somewhat difficult by Sutherland's actions even though she could breathe. My disagreement with the majority opinion is that C.K.'s testimony, which described Sutherland's conduct *and the consequence of that conduct on her ability to breathe,* does not constitute choking, and therefore, cannot support a conviction for second-degree domestic assault.

As noted by the majority, the term "choking" is not defined by statute. There is no definitive definition of choking in Missouri case law. Accordingly, our analysis is guided by the common definition of choking. "The primary rule of statutory construction is to ascertain the intent of the legislature from the language used, to give effect to that intent if possible, and to consider words used in the statute in their plain and ordinary meaning." Howard v. City of Kansas City, 332 S.W.3d 772, 779 (Mo. banc 2011). The plain and ordinary meaning of an undefined word is derived from the dictionary. Id. at 780.

The majority refers to Webster's Third New International Dictionary, which defines the verb "choke" as follows: "1: to make normal breathing difficult or impossible for (a person or animal) (1) by compressing the throat with strong external pressure . . . ." WEBSTER'S THIRD NEW INTERNATIONAL DICTIONARY 396 (1976). "Choking" is also defined as "producing

the feeling of strangulation"[1] while the verb to "choke" means "to check normal breathing of by compressing or obstructing the trachea or by poisoning or adulterating available air . . . ." MERRIAM-WEBSTER'S COLLEGIATE DICTIONARY 201 (10th ed. 1995). In its brief, the State proposed that this Court utilize yet another definition of "choke" provided by the American-Heritage Dictionary of the English Language. That dictionary defines to "choke" as "to interfere with the respiration of by compression or obstruction of the larynx or trachea." THE AMERICAN HERITAGE DICTIONARY OF THE ENGLISH LANGUAGE 337 (3d ed.1992). Each of these definitions is similar in that each requires interference with breathing by compressing the throat.

Despite C.K.'s layman characterization of Sutherland's conduct as "choking", C.K.'s specific testimony does not describe "choke" or "choking" under any of the definitions referenced above. Most of C.K.'s trial testimony addressed Sutherland's act of grabbing her neck and squeezing as opposed to the effect that conduct on her. During direct examination, the only testimony relating to the impact of Sutherland's acts on C.K.'s breathing is as follows:

> [PROSECUTOR]: How did you feel when he was holding you up against the wall?
>
> [WITNESS]: Scared.
>
> [PROSECUTOR]: Were you able to breathe at that point?
>
> [WITNESS]: Yeah, I was able to breathe. I mean, I didn't lose consciousness, but . . .

C.K. further described the Sutherland's conduct and effect of that conduct on her breathing during her cross-examination. C.K. testified as follows:

---

[1] "Strangulation" is "the action or process of strangling or strangulating." MERRIAM-WEBSTER'S COLLEGIATE DICTIONARY 1162 (10th ed. 1995). To "strangle" means "to choke to death by compressing the throat with something (as a hand or rope)" or "to obstruct seriously or fatally the normal breathing of." Id.

3

| [DEFENSE COUNSEL]: | All right. At some point he put his hand around your neck. That's your testimony, right? |
|---|---|
| [WITNESS]: | That's correct. |
| [DEFENSE COUNSEL]: | Okay. Now, while he had his hand around your neck, could you breathe? |
| [WITNESS]: | Yes. |
| [DEFENSE COUNSEL]: | And you never felt light-headed? |
| [WITNESS]: | That's correct. |

This combined testimony is the only evidence in the record addressing C.K.'s breathing either at the time or after Sutherland grabbed her neck and squeezed. Sutherland's conduct is not determinative of whether choking occurred. The effect of that conduct on C.K.'s breathing is what determines the outcome of this appeal. I remain unconvinced that any reasonable juror could infer from C.K.'s testimony that Sutherland's conduct made her breathing difficult or interfered in any way with her breathing.

I agree with the majority that a person's breathing need not be completely obstructed to constitute choking. However, the evidence before the jury, even when construing all inferences favorable to the State, lacked sufficient facts from which the jury reasonably could have found that C.K.'s breathing was made difficult in any manner whatsoever. C.K. testified that she could breathe. C.K. did not limit or condition this testimony. The record is void of any testimony or other evidence to support a factual finding or reasonable inference that Sutherland's conduct made C.K.'s breathing difficult or interfered in any way with C.K.'s breathing. The record reflects that Sutherland grabbed C.K.'s throat and squeezed. The majority holds that a reasonable juror could have inferred Defendant made C.K.'s normal breathing difficult by compressing the throat with strong external pressure. The failing of that analysis and conclusion is C.K.'s own

4

testimony, which did not indicate *any* limitation on her ability to breathe consistent with any of the definitions of choking referenced in the majority opinion or briefs filed in this appeal.

Had C.K. not testified regarding her ability to breathe, I would agree with the majority that a reasonable jury could infer that C.K. experienced some difficulty breathing as a natural result of Sutherland grabbing her neck and squeezing. But C.K. did testify about her breathing. C.K. testified that she could breathe despite Sutherland's conduct. C.K. testified that she never felt light- headed as a result of Sutherland's actions. I do not suggest that C.K. was required to testify that she could not breathe at all, felt as if she was losing consciousness, felt light-headed, or experienced similar physical responses to Sutherland's act of grabbing her throat in order to prove she was choked. However, even using the majority opinion's definition of choking, the evidence must demonstrate some modicum of interference with C.K.'s breathing to constitute choking and support a conviction of second-degree domestic assault. C.K. was asked if she could breathe and she said yes. C.K. testified affirmatively that she could breathe and offered no testimony from which a jury reasonably could infer that Sutherland's act of grabbing her neck and squeezing made her breathing difficult. Quite simply, C.K.'s layman's characterization of Sutherland's conduct as "choking" does not meet the legal requirements of choking under Missouri law.

Absent evidence that Sutherland's conduct made C.K.'s breathing difficult, the charge of second-degree domestic assault cannot stand. For that reason, I would reverse the conviction for second-degree domestic assault and remand this matter to the trial court for trial on the lesser included charge of domestic assault in the third degree.

_____
Kurt S. Odenwald, Judge